UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM AND
KESHUNA ABCUMBY,

        Plaintiffs,

                                        Case no: 13-14567

v.                                        Paul D. Borman
                                        United States District Judge

MICHIGAN DEPARTMENT OF
CORRECTIONS, DANIEL H. HEYNS, et al.,

        Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY (ECF NO. 11)

      Plaintiffs filed this class action complaint on November 1, 2013. (ECF No. 1). On January 21, 2014, Defendants Michigan Department of Corrections ("MDOC"), Daniel H. Heyns, Thomas Finco, Dennis Straub, Randy Treacher, and Millicent Warren filed the instant Motion to Dismiss and for Summary Judgment based upon Qualified Immunity. (ECF No. 11). Plaintiffs then filed their response. (ECF No. 17). Defendants thereafter filed a reply. (ECF No. 18).

      A hearing on this matter was held on June 20, 2014. For the following reasons the Court will GRANT IN PART AND DENY IN PART Defendants' motion to dismiss and for summary judgment.

### I. BACKGROUND

      Plaintiffs Amira Salem and Keshuna Abcumby (collectively "Plaintiffs") brought this class action suit on behalf of all female prisoners who "since October 2010, have been, are now,

or will be hereafter incarcerated by [the Women's] Huron Valley Correctional Facility and who have been subject to sexual harassment and degrading and unhygienic treatment by MDOC custodial staff." (Compl. ¶ 16). The Court notes that a class has not been certified in this action.

Plaintiffs have named six defendants in this action. Defendant Michigan Department of Corrections ("MDOC") is described by Plaintiffs as the department of the State of Michigan responsible for the care and custody of prisoners incarcerated in the State of Michigan. Plaintiffs allege that the MDOC has the responsibility, authority and ability to remedy current and future conditions at the Women's Huron Valley Correctional Facility ("WHV") that gave rise to the Plaintiffs' allegations.

Plaintiffs allege that Defendant Daniel H. Heyns is the director of the MDOC and his duties and responsibilities include developing and implementing polices and procedures for the operation and management of the MDOC and its employees. (Compl. ¶ 9). Plaintiffs contend that he is responsible for the care, custody and protection of prisoners under the jurisdiction of the MDOC. (*Id*.).

Plaintiffs allege that Defendant Thomas Finco is Deputy Director of the MDOC's Correctional Facilities Administration ("CFA") and has served in that capacity since October 1, 2011. (*Id*. at ¶ 10). Plaintiffs assert that Defendant Finco is responsible for the operation of all correctional institutions in the MDOC system including "promulgating and administering MDOC's policies." (*Id*.). Plaintiff allege that Defendant Dennis Straub was the Deputy Director of the MDOC's CFA prior to October 1, 2011 and he had the same responsibilities of Defendant Finco. (*Id*. at ¶ 11).

2

Plaintiffs next allege that Defendant Randy Treacher is the Chief Deputy Director of the CFA and his duties and responsibilities include the supervision of Defendants Straub and Finco. (*Id.* ¶ 12).

Finally, Plaintiffs allege that Defendant Millicent Warren is the Warden of WHV. (*Id.* ¶ 13). Warren describes her duties and responsibilities as overseeing the overall operation of WHV which "includes reviewing policy and practices at WHV and providing input to my supervisor, the Assistant Deputy Director, as well as MDOC central office on existing polices, proposed or instituted policy changes as well as operational activities to carry out MDOC policy." (Def.'s Br. Ex. A, Warren Aff. ¶ 3). Warren also attests that she is "the facility appointing authority, accountable for hiring, discipline and termination recommendations of staff, budget compliance and physical plan operations." (*Id.*).

A.      Strip Search and Chair Portion of the Strip Search

Prior to 2009, a standard strip search at a correctional facility that housed female prisoners in Michigan was conducted by female correction officers who would require the prisoner to "remove her clothing, bend forward, [to] allow[] for a visual inspection of the entrance to the vagina and rectal cavity; in such cases, the person [would] be required to bend and spread her buttocks, and cough. The female [officer] then performed a visual check of the inmate's mouth, nose, ears, hair and asked the prisoner to allow the officer clear view of areas behind ears and under breasts." (Warren Aff. at ¶ 6).

In 2009, the MDOC consolidated all of its female prisoners into one facility, the WHV. (Warren Aff. at ¶ 7). At that time the MDOC instituted what the Court shall refer to as "the chair portion of the strip search" in which a female prisoner must sit on a chair, open her knees, and

spread her labia to expose her vaginal cavity for a visual inspection by correction officers.
(Compl. ¶ 25).  These types of searches were performed after a prisoner returned from an off-site
visit (including hospital visits or leaving the prison on writ) and after each "contact visit" (*i.e.* a
visit in which a prisoner was allowed physical contact with her visitors).  (Warren Aff., Ex. C-1,
Policy Directive, 04.04.110, at 4).  Plaintiffs contend that the communal chairs on which they
were required to sit were "unwashed and unsanitized", were not lined with sanitary paper, and
were "wet with bodily fluids from other prisoners".  (*Id*.).  Plaintiffs allege that female prisoners
who suffered from communicable diseases such as "HIV, AIDS, tuberculosis, hepatitis C,
sexually transmitted diseases, and other vaginal infections" were all subject to the chair portion
of the strip search while on their menstrual cycles which resulted in blood being left on the
communal chairs used during the strip searches.  (*Id*. ¶ 26).

Defendants further clarified that the chair portion of the strip search was also used on the
East Side of WHV prior to Defendant Millicent Warren's appointment as warden in 2009.
(Def.'s Reply, Ex. A, Supp. Warren Supp. Aff. at ¶ 4).  In 2009, with the consolidation of all the
women's correctional facilities into one facility, the WHV, the MDOC determined that the chair
portion of the strip searches would also be implemented at the West Side of WHV.  (*Id*.).
Defendants contend that the decision to use the chair portion of the strip search was an attempt
"to better comply with the search depicted in the 1998 training video which showed how a
proper strip search of female offenders was to be done.  The additional step of using a chair was
added because of the awareness that females could hide contraband in their vagina."  (Warren
Aff. at ¶ 8; Ex. B, 1998 Training Video).  Further the "MDOC, at the time, believed that
incorporating a chair into the routine strip search procedure would aid staff in performing a more

4

thorough search for contraband and to better comply with MDOC policy on strip searches."
(*Id*.).

The 1998 training video, supplied under seal by Defendants, depicts how to conduct a strip search pursuant to PD 04-04-110, and instructs that during a routine strip search the female inmate is "required to sit and spread the lips of her vagina". The training video further advises that any tampon or sanitary napkin must be removed to allow the officer to visually search the vaginal opening. The training video is silent as to maintaining sanitary conditions or preventing the spread of communicable diseases. (*See* Ex. B, Training Video).

Plaintiffs claim that the chair portion of the strip search was actually promulgated to retaliate against the female prisoners at WHV following the 2009 settlement of an unrelated court case, *Neal, et al. v. MDOC, et al.*, case no. 96-6986-CZ, in which many female residents of WHV were plaintiffs. (Pls.' Resp. Ex. 4, Salem Aff. at ¶ 10, "I believe the institution of these searches was in direct retaliation for the Neal v MDOC case and its settlement agreement in 2009."). In support of this theory, both Plaintiffs attest that they were not subjected to the chair portion of the strip search until 2009. (Salem Aff. at ¶ 5; Abcumby Aff. at ¶¶ 2-3). Plaintiff Salem attested that she has been housed at WHV since 2005. (ECF No. 19, Supp. Salem Aff. at ¶¶ 3-4). Plaintiff Salem attests that she is not aware of any other female prisoner at WHV that was subject to the chair portion of the strip search prior to 2009. (ECF No. 19, Supp. Salem Aff. at ¶¶ 4, 6-7).

B.    Factual Allegations as to the Named Plaintiffs

Plaintiff Salem alleges that in 2009 through early 2012 she was subject to the chair portion of the strip searches and she was "ordered to get completely naked, sit on an unsanitized

chair, open her legs wide, and manually open her labia to allow correctional officers to peer into her vagina." (Compl. ¶ 40; *see also* ECF No. 19, Supp. Salem Aff. at ¶ 5). Plaintiff Salem is Muslim and asserts that her religion prohibits women from exposing themselves in that manner required by the chair portion of the strip search. (Compl. ¶ 41). Plaintiff Salem also alleges that she has been exposed to communicable diseases because of the chair portion of the strip search and has suffered from anxiety attacks, flashbacks of sexual abuse, psychological and mental distress and also avoided family and religious visitations due to the effects of the chair portion of the strip search. (*Id.* at ¶ 42; Pls.' Resp. Ex. 4, Salem Aff. at ¶¶ 13, 15).

Plaintiff Keshuna Abcumby alleges that between 2009 and 2012 she was subject to the chair portion of the strip search ten times, and on some occasions she was made to "hold her knees up and cough, as if pushing to deliver a baby." (Compl. ¶ 45; Pls.' Resp. Ex. 4, Abcumby Aff. at ¶ 3). Plaintiff Abcumby also claims that on occasion, disinfectant spray was made available to clean the chair used in the strip search but that the spray was not allowed sufficient time to remain on the chair to work effectively per the label instructions. (Compl. at ¶ 46). Plaintiff Abcumby alleges that because of these searches she has suffered multiple vaginal bacteria infections, anxiety attacks, flashbacks of sexual abuse, nightmare, night sweats, nausea, vomiting, abnormal menstrual cycles, headaches, high blood pressure, and psychological and mental distress." (*Id.* ¶ 47; Abcumby Aff. ¶¶ 10, 14).

C.     MDOC Memoranda regarding the Chair Portion of The Strip Search

Defendants acknowledge that during 2010 and 2011 they became aware of complaints from the inmates at WHV regarding the chair portion of the strip search. (Warren Aff. ¶ 9). Defendants assert that they received 67 grievances regarding some aspect of the chair portion of

the strip search and they also received 30 complaints to WHV psychological services regarding the same with possible overlap between the inmates that filed the grievances and the inmates that complained to psychological services.  (*Id*. at 11; Ex. A, 12/14/11 Memo at 5).  Plaintiffs dispute Defendants' accounting of grievances and claim that as of December 14, 2011 there were more than 70 grievances filed and also claim that the total number of grievances filed regarding the chair portion of the strip search exceeds 500.  (Pls.' Resp. at 8; Pls.' Resp., Ex. 4, Appendix of inmates who have filed grievances concerning the chair portion of the strip search both before and after December 14, 2011).[1]  Further, Plaintiffs allege that many grievances filed on this issue were rejected because MDOC does not allow inmates to challenge policies and procedures and there is no alternative mechanism to exhaust the claims in the Complaint.  (Compl. ¶ 36).

Defendants state that in response to the 67 grievances and 30 complaints to psychological services, Warren began an administrative fact finding and review process regarding the "necessity of continuing the chair portion of the strip search."  (Warren Aff. ¶¶ 4, 12).  Additionally, on June 3, 2011, Warren issued a Memorandum regarding the 04-04-110 Policy Directive.  (Defs.' Br., Ex. B, 6/3/11 Memo), which stated that effective immediately the language in the 04-04-110 Policy Directive regarding "Search and Arrest at Women's Huron Valley Correctional Facility" under the heading "Searches" would read as follows:

---

[1] Plaintiffs state in their response that there are more than 500 grievances and refer to their exhibit 4, which is a numbered list of inmate names and corresponding inmate numbers. Plaintiffs represent that this is a list of all of the names of inmates that have filed grievances concerning the chair portion of the strip search both before and after December 14, 2011. Plaintiffs argue that the number of grievances filed before December 14, 2011 is more than 70, however it is unclear from the record what number of grievances were filed prior to December 14, 2011.

3. Strip Search: Visual inspection of all body surfaces of a person who has been required to remove all or most of his/her clothing and jewelry for purposes of the search. This includes visual inspection of the mouth, ears, and nasal cavities. Unless determined by the Warden to be unnecessary for an assignment within the security perimeter which requires a strip search (e.g., Michigan State Industries), it also includes visual inspection of the entrance to the vagina and rectal cavity; in such cases, the person will be required to bend and spread her buttocks and sit on a sanitary paper lined chair and spread her knees so as to spread the lips of her vagina to allow inspection. All clothing and articles which are removed also shall be inspected for contraband.

NOTE: If necessary, the prisoner may be required to manually spread the lips of her vagina with her hands. If this procedure is necessary, the prisoner will be allowed to sanitize their hands before and after this procedure with an approve[d] sanitizer.

(6/3/11 Memo).[2] Warren went on to state in the June 3, 2011 memorandum that an approved

sanitizer would be located in each strip search room and "shall be available whenever a strip

search needs to be performed". (*Id*.).

Then on December 14, 2011, in response to the 67 grievances and 30 complaints to

psychological services and as a result of her fact-finding investigation, Warren issued a fifteen

page memorandum on the issue of whether the "'chair portion of the regular post contact visit

---

[2] Although unclear, it appears that the language in Policy Directive 04-04-110, effective on April 24, 2009 (and through June 3, 2011) defined "Strip Search" under the heading "Searches", in relevant part, a "[Strip Search] also includes visual inspection of the entrance to the vagina and rectal cavity; in such cases, the person will be required to bend and spread his/her buttocks, and spread the lips of her vagina, to allow inspection. All clothing and articles which are removed also shall be inspected for contraband." (Warren Aff., Ex. C-1, PD 04-04-100, Eff. 4/24/09). There is no mention of a chair being used in this procedure. However, in Operating Procedure 04-04-110, effective May 1, 2009, a "Strip Search" is defined, in relevant part, as "[Strip Search] also includes visual inspection of the entrance to the vagina and rectal cavity; in such cases, the person will be required to bend and spread her buttocks and sit on a sanitary paper lined chair and spread her knees so as to spread the lips of her vagina to allow inspection. All clothing and articles which are removed also shall be inspected for contraband." (Warren Aff, Ex. C-2, OP 04-04-110, Eff. 5/01/09).

strip search be continued as a matter of routine?"  (Warren Aff., Ex. A, 12/14/11 Memo at 1).  In the memo, Warren recounted the history of the chair portion of the strip search stating that the chair portion of the strip search was "instituted in an effort to operate the facility in complete accord with MDOC policy" specifically a 1998 training video which provided that female inmates should sit and spread the lips of their vagina for visual inspection during a routine strip search.  (*Id.*; *see also* Ex. B, 1998 Training Video).  Warren also explained that "MDOC Central Office, after discussion with the WHV warden, decided the use of the chair and visual inspection of the vaginal opening was an important part of the strip search of female prisoners after contact visits ..." (12/14/11 Memo at 2). The December 14, 2011 Memo then addressed six factors that Warren considered regarding whether to continue the chair portion of the routine strip search. (*Id.* at 3).

The first factor considered was random drug/urine test results of the WHV inmates from 12/31/09 through 8/23/11.  These results offered no evidence regarding the efficacy of the search method, however, because the chair portion of the strip search had been in use since the facility's consolidation, so there were no results for comparison.  The second factor Warren investigated was the "comments from mental health services" regarding prisoner complaints or suggestions of harm due to participating in the chair portion of the strip search.  (*Id.* at 4-5).  Warren noted that interviews with members of the mental health services revealed that mental health services had received approximately 25-30 complaints regarding the chair portion of the strip search.  (*Id.* at 5).  One health services member noted that he received "a number" of complaints in early 2009 when the practice was first introduced but had received "few recent complaints".  (*Id.*).  Warren stated that the complaints only constituted 1.7% of the prisoner population, and further noted that

the fact that the members interviewed could not identify any prisoner who they believed suffered psychological harm or was injured as a result of the policy meant any complaints made were not "persistent." (*Id*. 5-6). Another health services member interviewed noted that two or three prisoners "claimed that the strip search exacerbated trauma from pre-prison sexual abuse that they had experienced." (*Id*. at 6). That doctor "found these complaints plausible. He noted, that the experience of the chair portion of the strip search could theoretically 'refresh' or 'reawaken' the experience of past sexual abuse in some prisoner patients." (12/14/11 Memo at 6). Warren concluded that the mental health professionals would describe the chair portion of the strip search as a "stressor" that was more than a minor irritation but "less than an event that actually caused psychological harm o[r] damage in and of itself." (*Id*. at 6-7).

The third factor Warren considered were the grievances filed by prisoners that mentioned the chair portion of the strip search "as objectionable." (*Id*. at 7). Warren stated that the (approximate) 67[3] grievances represented 4% of the total population that were allowed contact visits, and also noted that 96% of the grievances related specifically to the chair portion of the strip search and the requirement that inmates spread their labia for the female officers to inspect. In those grievances, the prisoners stated they felt "degraded", "humiliated", "sexualized" and uncomfortable with having to touch themselves. (*Id*.). Warren then noted that WHV "attempted" to make sure the strip search rooms had gloves, sanitary chair covers, paper towels, disinfectant, trash cans and hand sanitizer, but noted that 42% of the grievances claimed that the chair portion of the strip search was unsanitary. (*Id*.).

---

[3] The briefing also represents that the number of grievances filed was 69.

10

Warren next examined the log of voluntary non-contact visits and found that prisoners did not utilize a non-contact visit option that would allow them to avoid the chair portion of the strip search altogether.  (*Id*. at 8).  Therefore, Warren concluded that the strip search was not a significant inhibitor to participating in contact visits because inmates overwhelming chose to have a contact visit even when the visitor was a friend, clergy or unfamiliar volunteer rather than avoiding the strip search by opting to have a non-contact visit.  (*Id*. at 8-9).

Warren also surveyed officers who conducted the strip searches on inmates after contact visits.  (12/14/11 Memo at 9-10).  Of the officers surveyed, 75% believed that the chair portion of the strip search was not necessary for the security of the facility.  (*Id*. at 10).  Additionally, 100% of the officers surveyed believed they could conduct a strip search effectively without requiring the prisoner sit on a chair.  (*Id*.).  Finally, 63% of the officers surveyed answered that yes, they believed the chair portion of the strip search could be "conducted in a way that maintains your and the prisoner's dignity and self-respect."  (*Id*. at 10-11).

The last factor considered by Warren was the fact that since the policy began there had been only one instance of contraband being found in an inmate's vagina.  (*Id*. at 11).  However, the contraband (a pair of earrings) was not found during the chair portion of the strip search but rather during the portion of the strip search when an inmate is required to bend over, spread her buttocks and cough.  (*Id*.).  Also, that inmate had just arrived from a different jail and she was likely unaware of WHV's routine strip search policy.  (*Id*. at 11-12).

Warren summarized her findings in the memorandum, concluding:

[o]n balance the increased security benefit provided by the use of the chair portion of the strip search, on the present data may not be sufficiently great to require, even though it allows, the modest stressor of continued use of the chair portion of the routine post contact visit strip search. ... the chair portion of the

11

> strip search appears viewed by both prisoners and the staff conducting the strip searches as an unnecessary irritation. Therefore, I have decided to suspend the routine use of the chair portion of the strip search following contact visits effective Friday, December 16, 2011.

(12/14/11 Memo at 14-15; *see also* Pls.' Resp. Ex. 2, 12/13/11 Notice to Staff stating the chair portion of the strip search is "no longer authorized" as of 12/16/2011).

D.      MDOC's Current Policy

Warren attests that after December 16, 2011 the chair portion of the strip search has not "been regularly employed by WHV staff, pursuant to the current policy." (Warren Aff. ¶ 15). Warren further asserts that she has no intention of re-instituting the policy "on a routine basis, absent some exigent circumstance". (*Id*. at ¶ 16).

Plaintiffs dispute that the chair portion of the strip search no longer occurs and claim that the chair portion of the strip search was utilized against them at some point in 2012 at WHV. (*See* Abcumby Aff. at ¶ 15, "I have been subjected to similar searches throughout the years of 2011 and 2012."; Salem Aff. at ¶ 5, "I have been subjected to the spread-labia vaginal inspection search at least 5 times between 2009 and 2012."). Plaintiffs also point to an attached appendix of inmate names who have allegedly filed 500 grievances regarding the chair portion of the strip search both before and after the date it was allegedly abrogated to illustrate that the search procedure is still being used. (*See* Pls.' Resp., Ex. 4, Appendix). However, it is unclear from the index the date of when those grievances were filed as only the names of the inmates are provided.

II. STANDARD OF REVIEW

Defendants style their present motion as a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) and also as a motion for summary judgment pursuant to FED. R. CIV. P. 56(a).

12

Rule 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). The Supreme Court explained that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  Dismissal is only appropriate if the plaintiff has failed to offer sufficient factual allegations that make the asserted claim plausible on its face. *Id.* at 570.

Pursuant to Rule 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The moving party bears the initial burden of showing that there is no genuine issue of material fact, but once this burden is met, the opposing party must produce some facts showing there is a genuine issue for trial. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 587 (1986).  The Court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties

13

will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id*. at 247-48 (emphasis in original).

Pursuant to FED. R. CIV. P. 12(d), on a motion under Rule 12(b)(6) or 12(c), when "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." In the present motion, Defendants attach and rely upon affidavits, a training video, as well as pertinent MDOC memoranda, and policy and operating directives. Plaintiffs' response to the motion further relies upon affidavit testimony of the Plaintiffs, memoranda, policy directives, and an appendix of inmate names that allegedly correspond to grievances filed regarding the chair portion of the strip search procedure. Therefore, to the extent that this Court relies upon Defendants' and Plaintiffs' proffered evidence, the Court construes Defendants' motion as one for summary judgment under FED. R. CIV. P. 56(a).

## III. ANALYSIS

### A.    Eleventh Amendment

Plaintiffs' complaint, in establishing proper jurisdiction, notes specifically that "Defendants named herein as public officials of the State of Michigan [are] sued in their official and individual capacities for violations of Plaintiffs' statutory and constitutional rights." (Compl. ¶ 5). Plaintiffs' complaint also provides that in addition to costs, expenses, and damages (including punitive damages), Plaintiffs seek a permanent injunction against Defendants prohibiting them from "subjecting Plaintiffs to polices and procedures that violate their constitutional statutory rights, and common law rights", and remediation of certain prison conditions (namely the prohibition of the chair portion of the strip search). (Compl. at *14).

14

Defendants contend that to the extent that Plaintiffs' claims are brought against the individual defendants in their official capacities for money damages, those claims are barred pursuant to the Eleventh Amendment.  Plaintiffs concede this point, noting that "[t]he MDOC is a state agency and is therefore entitled to sovereign immunity from Plaintiff's [sic] suit for monetary damages" and that "Eleventh Amendment immunity extends to state officials or employees sued in their official capacities."  (Pls.' Resp. at 11).  Indeed, it is well settled that when a plaintiff seeks monetary damages from individual defendants in their official capacities, those claims are barred by the Eleventh Amendment.  *Thiokol Corp. v. Dep't of Treas.*, 987 F.2d 376, 381 (6th Cir. 1993); *Evans v. Vinson*, 427 F. App'x 437, 441 (6th Cir. 2011) (recognizing the same).  Therefore, Plaintiffs' claims insofar as they seek money damages against the MDOC or against the individual defendants sued in their official capacity are barred by the Eleventh Amendment.[4]

However, the Eleventh Amendment does not bar suits against government officials sued in their official capacities for prospective injunctive relief.  Therefore, as Plaintiffs also appear to be seeking prospective injunctive relief against the Defendant officials in their official capacity and these claims are not barred.  *See Will v. Mich Dep't of State Police*, 491 U.S. 58, 71 n. 10 (1989) (citation omitted); *see also Ex Parte Young*, 209 U.S. 123, 159-60 (1908); *Pucci v. 19th District Court*, 628 F.3d 752, 765 (6th Cir. 2010) *Sutton v. Evans*, 918 F.2d 654, 657 (6th Cir. 1990).

---

[4] Plaintiffs request the chance to amend their complaint if it is unclear whether they are suing the individual Defendants in their official and individual capacities.  However, Plaintiffs explicitly set forth in their complaint that they are suing the individual officers in both their individual and official capacities so there is no need for Plaintiffs to amend their complaint.

15

B.      Section 1983

To establish a claim pursuant to 42 U.S.C. § 1983, a plaintiff must assert that a right

secured by the Constitution or a federal law has been violated, and that the violation was caused

by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). "Persons

sued in their individual capacities under 1983 can be held liable based only on their own

unconstitutional behavior." *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012)

(citations omitted). "This court has held that § 1983 liability must be based on more than

respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300

(6th Cir. 2005). In the present action there appears to be no dispute that the Defendants acted

under the color of state law with regards to any action they took with regards to the strip search

policy. Therefore, the only issues that remain are whether the Defendants deprived the Plaintiffs

of any rights protected by the Constitution or federal law.

1.      Possible Fourteenth Amendment Claims

Defendants argue that to the extent Plaintiffs claim a violation of their substantive due

process rights in connection with the chair portion of the strip search it is the Eighth

Amendment, and not the Fourteenth Amendment, that is the proper source of that protection

because it is the "primary source of protection against the wanton infliction of pain". (Defs.' Br.

at 19). Defendants cite *Whitley v. Albers*, 475 U.S. 312 (1986) for this proposition. In *Whitley*,

the Supreme Court found that the Eighth Amendment is the primary source of substantive

protection for convicted prisoners against the wanton infliction of pain "in cases such as this one,

where the deliberate use of force is challenged as excessive and unjustified [under the Fourth

Amendment]." *Id*. at 327. Here, however, it appears that any Fourteenth Amendment claim

16

Plaintiffs assert in their complaint is asserted in conjunction with her Fourth Amendment claim based on a violation of Plaintiffs' right to privacy, not an excessive force claim. (*See* Compl. at ¶¶ 57–64). Therefore, Defendants' argument that Eighth Amendment is controlling is off the mark.

The Defendants are correct, however, that where an explicit textual source of constitutional protection exists, that source rather than the more generalized notion of substantive due process is the guide for analyzing the claim. *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990); *see also Albright v. Oliver*, 510 U.S. 266, 273 (1994). The Sixth Circuit has explicitly recognized a prisoner's "'privacy' right against the forced exposure of one's body to strangers of the opposite sex [as being] located in the Fourth Amendment." *Everson v. MDOC*, 391 F.3d 737, 757 n. 26 (6th Cir. 2004) (citing *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992)); *see also Stoudemire v. MDOC*, 705 F.3d 560, 572 (6th Cir. 2013) (providing that "we have noted, 'a convicted prisoner maintains some reasonable expectations of privacy while in prison ... even though those privacy rights may be less than those enjoyed by non-prisoners." (quoting *Cornwell*, 963 F.2d at 916)). In this action, Plaintiffs' constitutional claims are based on alleged violations of their right to privacy and those rights are explicitly located in the Fourth Amendment (and made applicable to the states through the Fourteenth Amendment). Therefore, the Court will analyze Plaintiffs' claims through the framework of the Fourth Amendment rather than the more generalized notion of substantive due process pursuant to the Fourteenth Amendment.

Moreover, Plaintiffs fail to address Defendants' argument regarding a possible Fourteenth Amendment due process claim whatsoever. Indeed, Plaintiffs failed to differentiate

any possible Fourteenth Amendment due process claim from their Fourth or Eighth Amendment

claim in their response or during oral argument.  Therefore, the Court finds that Plaintiffs have

abandoned any due process claim pursuant to the Fourteenth Amendment arising under the facts

alleged in this action.  *See Brown v. VHS of Mich.*, Inc., 545 F. App'x 368, 372 (6th Cir. 2013)

(holding "[t]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to

have abandoned a claim when a plaintiff fails to address it in response to a motion for summary

judgment.") (collecting cases)).

    2.    Eighth Amendment Claim and Qualified Immunity

Plaintiffs' assert that the individual Defendants violated their Eighth Amendment rights.

The individual Defendants claim that they are entitled to qualified immunity on Plaintiffs'

Eighth Amendment claim.

The doctrine of qualified immunity generally protects "government officials performing

discretionary functions ... from liability for civil damages insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of qualified

immunity is to "shield the official from suit altogether, saving him or her from the burdens of

discovery and costs of trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law." *Humphrey v.

Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

A government official is entitled to qualified immunity "unless a plaintiff pleads facts

showing: "(1) that the official violated a statutory or constitutional right and (2) that the right

18

was 'clearly established' at the time of the challenged conduct."[5] *Ashcroft v. al-Kidd*, --- U.S. ---
, 131 S. Ct. 2074, 2080 (2011) (citation omitted).  The order of the inquiry is no longer

mandatory and Courts are allowed to use their discretion in deciding which of the two steps of

the qualified immunity analysis should be addressed first.  *Id.* (citing *Pearson v. Callahan*, 555

U.S. 223, 236 (2009)).  Once a government official has raised the defense of qualified immunity,

the plaintiff must bear the burden to demonstrate that the defense is unwarranted.  *Roth v.*

*Guzman*, 650 F.3d 603, 609 (6th Cir. 2007).  A constitutional right is clearly established when "it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  "But under either prong, courts may

not resolve genuine disputes of fact in favor of the party seeking summary judgment."  *Tolan v.*

*Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014).

     As to whether the individual Defendants violated the Plaintiffs' constitutional rights,

Plaintiffs allege that the Defendants' "implementation" of the chair portion of the strip search

violates the prohibition against cruel and unusual punishment and that the Defendants "failed to

adequately train, supervise and/or institute and implement adequate policies and procedure to

conduct searches constitutes deliberate indifference to Plaintiffs' health, safety, privacy and

bodily integrity in violation" of the Eighth Amendment.  (Compl. ¶¶ 50, 52).  Plaintiffs allege

that Defendants are "individually liable" for these Eighth Amendment violations because "they

and/or their agents (1) participated in creating and carrying out the unconstitutional policies that

caused the harm to each Plaintiff; (2) failed to take necessary steps to ensure the safety and

---

     [5] Some Sixth Circuit panels have also used a "third step requiring the court to determine
whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly
did was objectively unreasonable in light of the clearly established right." *Grawey v. Drury*, 567
F.3d 302, 309 (6th Cir. 2009) (citations omitted).

well[-]being of each Plaintiff; and (3) implicitly authorized, approved or knowing[ly] acquiesced in the unconstitutional conduct of offending MDOC staff."  (Compl. ¶ 53).

Plaintiffs' claims regarding violations of the Eighth Amendment relate to the conditions of confinement at WHV as they claim the conditions relating to the chair portion of the strip search were unsanitary.  The Supreme Court has recognized that prison conditions can constitute a cruel and unusual punishment in violation of the Eighth Amendment if those conditions lead to "deprivations of essential food, medical care, or sanitation."  *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981).  Moreover, prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment."  *Id.* at 347.

"[A] prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation alleged must be, objectively, "sufficiently serious," such that "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities'" or that an inmate is "incarcerated under conditions posing a substantial risk of serious harm."  *Farmer*, 511 U.S. at 834 (internal citation omitted); *see also Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (holding same).  The second, subjective, requirement is that the prison official must have a "culpable state of mind"; "[i]n prison-conditions cases[,] that state of mind is one of 'deliberate indifference' to inmate health or safety."  *Id.* (citations omitted).  "Satisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.'" *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)).

20

a.      Objective Component

The Court need not reach the question of whether the possibility of exposure to communicable diseases as alleged in this action constitutes a "sufficiently serious" risk of serious harm because the Court finds that Plaintiffs cannot establish the subjective component of the Eighth Amendment inquiry as to the individual liability of the Defendants as examined, *infra*.

b.      Subjective Component

The Court notes that "it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Stoudemire v. MDOC*, 705 F.3d 560, 570 (6th Cir. 2013) (quotation omitted). Therefore, "the question of whether an official possessed the requisite knowledge and culpable mental state to sustain a deliberate indifference claim 'must be addressed for each officer individually.'" *Id.* (quoting *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)). In regard to the subjective element, an officer must have "both be[en] aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], he must also [have] draw[n] the inference." *Farmer*, 511 U.S. at 837. "An officer's knowledge of the risk may be demonstrated through circumstantial evidence and inference, and 'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Barker,* 649 F.3d at 434 (quoting *Farmer*, 511 U.S. at 842).

Here, Plaintiffs allege that the individual Defendants "failed to adequately train, supervise and/or institute and implement adequate policies and procedures" such that their Eighth Amendment rights were violated. (Compl. ¶ 52). Supervisory officials, however, "are

not liable in their individual capacities unless they 'either encouraged the specific incident of

misconduct or in some other way directly participated in it.  At a minimum, a plaintiff must show

that the official at least implicitly authorized, approved, or knowingly acquiesced in the

unconstitutional conduct of the offending officers.'" *Heyerman v. County of Calhoun*, 680 F.3d

642, 647 (6th Cir. 2012) (quoting *Hayes v. Jefferson Cnty.*, 668 F.2d 869, 872 (6th Cir. 1982)).

Indeed, § 1983 liability "must be based on more than respondeat superior, or the right to control

employees."  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

      1.     Defendants Heyns, Finco, Straub, and Treacher

In the present action, Plaintiffs have failed to evidence or allege any particularized facts

against Defendants Daniel H. Heyns, Thomas Finco, Dennis Straub, or Randy Treacher beyond

their general job descriptions.  Indeed, Plaintiffs have not made any arguments or set forth any

facts on the part of Defendants Heyns, Finco, Straub, or Treacher in the Complaint, their

response, or during oral argument regarding these Defendants' individual state of minds such

that they were both aware of facts from which an inference could be drawn that a substantial risk

of harm existed to the Plaintiffs or that they actually drew that inference.[6]  *Stoudemire*, 705 F.3d

at 570 ("it is well-settled that qualified immunity must be assessed in the context of each

individual's specific conduct." (citation omitted)); *Heyerman*, 680 F.3d at 647 ("[p]ersons sued

in their individual capacities under § 1983 can be held liable based only on their own

unconstitutional behavior.").  Indeed, Plaintiffs do not address or differentiate the conduct of

---

[6] Indeed, Plaintiffs' argument in their Response brief states only that the "MDOC was on actual notice that the inmates were being subjected to unnecessary psychological and physical harm" and that the MDOC ignored and "condoned them and perpetuated their continuance". (Pls.' Resp. at 19).  Further, Plaintiffs only separately address Defendant Warren, arguing that she was deliberately indifferent in her actions.  (*Id.*).

these individual officers whatsoever.  Where Plaintiffs have failed to address or make any arguments regarding Defendants Heyns, Finco, Straub, and Treacher, those Defendants are entitled to qualified immunity.

Moreover, the failure to separately address these individual Defendants or make any arguments regarding their personal involvement indicates that Plaintiffs' attempt to sue them in their individual capacities is merely a fiction.  Indeed, Plaintiffs' claims against Defendants Heyns, Finco, Straub, or Treacher appear to be lodged against these defendants in their official capacity and/or "improperly conflate[] a § 1983 claim of individual supervisory liability with one of municipal liability."  *Phillips v. Roane Cnty., Tenn*., 534 F.3d 531, 543 (6th Cir. 2008) (reasoning that allegations regarding officers were not properly trained were "more appropriately submitted as evidence to support a failure-to-train theory against the municipality itself, and not the supervisors in their individual capacities."); *see also Heyerman*, 680 F.3d at 647 (holding that a plaintiff's attempt to hold a prosecuting attorney liable in her individual capacity for the continuation of a policy or following of a policy improperly conflated a § 1983 claim "of individual supervisory liability with one of municipal liability"); *Miller v. Calhoun Cnty*., 408 F.3d 803, 817 n. 3 (6th Cir. 2005) (noting that where a plaintiff failed to allege or present any evidence that the individual defendants had any personal involvement in the alleged underlying misconduct, a "failure-to-train" claim lodged against those individual defendants was properly construed as a claim against the individuals in their official capacities, which in turn is treated as a claims against the county.); *see also Broyles v. Corr. Med. Services, Inc*., 478 F. App'x 971, 977 n. 1 (6th Cir. 2012) (noting that allegations regarding a prison supervisor's implementation of a policy or practice would be relevant to the prison official's liability in his official capacity.).

23

2.      Defendant Warren

Plaintiffs more specifically allege that Defendant Warren was personally involved in the creation and implementation of the chair portion of the strip search policy.  (Compl. ¶¶ 13-15). It is undisputed that Defendant Warren was personally aware of 67 grievances filed by prisoners regarding the practice and some 30 complaints to WHV psychological services and decided to investigate the issue in 2011.  (Warren Aff. ¶¶ 9-11).  To that end, Defendant Warren issued two memoranda regarding the chair portion of the strip search, the first in June 2011 specifying that certain procedures must be followed to ensure sanitary conditions, and in December 2011 providing the results of her investigation and concluding that the chair portion of the strip search would no longer be routinely practiced as of December 16, 2011.  (Ex. B, 6/3/2011 Memo; 12/14/2011 Memo).

In the instant case, Plaintiffs argue that "[d]espite warnings from psychologists on her staff that the searches could cause severe psychological stress in some female inmates, and despite complaints and grievances concerning the transmission of infection and serious adverse psychological impact, the warden still implemented and continued the policy."  (Pls.' Resp. at 19).  However, the record is clear that Defendant Warren became aware of complaints regarding the chair portion of the search in 2010 and 2011 which spurred "an administrative fact finding and review" regarding the procedure which included seeking opinions of the psychologists on her staff.  (Warren Aff. ¶¶ 11-14).  As a result of that inquiry, and after receiving the opinions of her staff psychologists on her staff, Defendant Warren formally abandoned the policy.  (12/14/11 Memo).  Additionally, ostensibly because of these same complaints, by April 2011 Defendant Warren required that a disposable seat cover be used and hand sanitizer be available during the

24

chair portion of the strip search.  (Warren Aff. ¶ 10).  On June 3, 2011, the language of the Operating Procedure 04.04.110 was changed to reflect these changes.  (Ex. B, 6/3/2011 Memo). Finally, during the fact finding review, Defendant Warren directed the staff to "allow prisoners who did not want to be subject to a strip search following a contact visit, to be allowed to choose a non-contact visit."  (*Id.* ¶ 13; Ex. D, 4/5/2011 Memo).

The Supreme Court has provided that "prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause".  *Farmer*, 511 U.S. at 845. Indeed, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844; *see also Street v. Corr. Corp. of Am.*, 102 F.3d 810, 817 (6th Cir. 1996) (quoting same).  Even when viewed in a light most favorable to Plaintiffs, the present facts cannot establish that Defendant Warren was deliberately indifferent to Plaintiffs' Eighth Amendment rights in regards to the chair portion of the strip search.  Indeed, Plaintiffs cannot dispute that Defendant Warren's response to complaints regarding the chair portion of the strip search was reasonable given that she officially changed the policy and instituted sanitary practices.  Accordingly, Defendant Warren, in her individual capacity, is entitled to qualified immunity from Plaintiffs' Eighth Amendment claim where Plaintiffs cannot establish a constitutional violation on her part where the record reflects her knowledge of prisoner's complaints, her inquiry in to the matter, her actions to make the search sanitary, and her direction that prisoners could choose to avoid the chair portion of the search by foregoing contact visits, and her formal abandonment of the policy.

    3.      Fourth Amendment Claims and Qualified Immunity

The Court notes that is it unclear from Defendants' initial briefing whether they were seeking qualified immunity for Plaintiffs' § 1983 claims based on violations of the Fourth Amendment. However, Plaintiffs assumed as much in their Response and Defendants noted in both their Reply brief (at 4) and stated during their oral argument that the individual Defendants are seeking qualified immunity on the Fourth Amendment claim.

As stated previously, a government official is entitled to qualified immunity and is shielded from money damages "unless a plaintiff pleads facts showing: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *al-Kidd*, 131 S. Ct. at 2080 (citation omitted). The order of this inquiry is no longer mandatory. *See Pearson*, 555 U.S. at 236. Again, this Court stresses that qualified immunity must be assessed on an individual basis. *Stoudemire*, 705 F.3d at 570 ("it is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." (citation omitted)); *Heyerman*, 680 F.3d at 647 ("[p]ersons sued in their individual capacities under § 1983 can be held liable based only on their own unconstitutional behavior.").

    A.      Defendants Heyns, Finco, Straub, and Treacher

In the context of their Fourth Amendment claims, Plaintiffs claim that the Defendants are individually liable for the "unconstitutional conditions" at WHV because they "(1) participated in creating and carrying out the unconstitutional policies that caused harm to each Plaintiff; (2) failed to take necessary steps to ensure the safety and wellbeing of each Plaintiff; and (3) implicitly authorized, approved or knowing[ly] acquiesced in the unconstitutional conduct of

26

offending MDOC staff."  (Compl. at ¶ 61).  However, Plaintiffs fail to carry their burden in

showing the individual Defendants, Heyns, Finco, Straub and Treacher, are not entitled to

qualified immunity on the Fourth Amendment claims, where they have failed to differentiate the

individual conduct of these Defendants.  *See Roth*, 650 F.3d at 609 (holding that it is plaintiff's

burden to show that the defense of qualified immunity is unwarranted).  As examined *supra* in

the context of Plaintiffs' Eighth Amendment claims, qualified immunity must be assessed on an

individual basis and specific to each defendant's conduct.  Here, Plaintiffs have again failed to

plead any particular facts beyond their general job descriptions connecting Defendants Heyns,

Finco, Straub and Treacher to their Fourth Amendment allegations.  Therefore, for the same

reasons Plaintiffs failed to state Eighth Amendment claims against Defendants Heyns, Finco,

Struab, and Treacher,  the Court finds that Plaintiffs have failed to state Fourth Amendment

claims against Defendants Heyns, Finco, Straub, and Treacher and those Defendants are entitled

to qualified immunity.

       B.      Defendant Warren

Plaintiffs have set forth particular facts and allegations regarding Defendant Warren in

connection to their Fourth Amendment claim.

       1.      Constitutional Violation

It well settled that the Sixth Circuit recognizes that "a convicted prisoner maintains some

reasonable expectations of privacy while in prison ... even though those privacy rights may be

less than those enjoyed by non-prisoners."  *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir.

1992) (citing *Bell v. Wolfish*, 441 U.S. 520, 558 (1979) and *Kent v. Johnson*, 821 F.2d 1220,

1226-27 (6th Cir. 1987)) (acknowledging that a prisoner "particularly" maintains a limited right

to privacy against "forced exposure to strangers of the opposite sex".); *Everson v. MDOC*, 391

F.3d 737, 757 n. 26 (6th Cir. 2004) (recognizing same).  Further, as the Sixth Circuit recently

noted, there is a "dignitary interest 'inherent in the privacy component of the Fourth

Amendment's proscription against unreasonable searches.'"  *Stoudemire v. MDOC*, 705 F.3d

560, 573 (6th Cir. 2013).

 When a court evaluates whether a prison regulation infringes upon a prisoner's

constitutional rights, "the regulation is valid if it is *reasonably related to legitimate penological*

*interests.*"  *Cornwell*, 963 F.2d at 916-17 (emphasis in original) (quoting *Turner v. Safely*, 482

U.S. 78, 89 (1987)); *see also Florence v. Board of Chosen Freeholders of the County of*

*Burlington*, --- U.S. ---, 132 S. Ct. 1510, 1515 (2012) (citing the same in regards to pretrial

detainees and explaining that this test "confirm[s] the importance of deference to correctional

officials" ).  In *Bell v. Wolfish*, the touchstone case regarding the constitutionality of strip

searches, the Supreme Court explained:

> [t]he test for reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.  In each case it requires a balancing
> of the need for the particular search against the invasion of personal rights that the
> search entails.  Courts must consider the scope of the particular intrusion, the
> manner in which it is conducted, the justification for initiating it, and the place in
> which it is conducted.

441 U.S. 520, 559 (1979) (upholding policy of suspicionless strip searches of pretrial detainees

and convicted prisoners).  The job of evaluating whether a prison policy is reasonably related to

legitimate security interests "is 'peculiarly within the province and professional expertise of

corrections officials.' ... [and] 'in the absence of substantial evidence in the record to indicate

that the officials have exaggerated their response to these considerations courts should ordinarily

defer to their expert judgment in such matters.'"  *Florence*, 132 S. Ct. at 1517 (internal citations

omitted).[7]

Therefore, as required by *Bell* and *Florence*, and reflected in the recent Sixth Circuit decision of *Stoudemire*, this Court must balance the need for the particular search against the invasion of prisoners' personal rights and to this end, "consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell*, 441 U.S. at 559; *Florence*, 132 S. Ct. at 1516 (relying on same); *see also Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014) (applying the same factors in evaluating strip searches of pretrial detainees). The Court views the facts in a light most favorable to Plaintiffs.

---

[7] Both parties cite to the factors set forth in *Cornwell*, ostensibly from *Turner*, where the Supreme Court set forth certain enumerated factors to aid in determining whether the prison policy is reasonably related to a legitimate penological interest:

> (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest asserted to justify it; (2) the existence of alternative means for inmates to exercise their constitutional rights; (3) the impact that accommodation of these constitutional rights may have on other guards and inmates, and on the allocation of prison resources; and (4) the absence of ready alternatives as evidence of the reasonableness of the regulation.

*Cornwell*, 963 F.2.d at 917 (citing *Michenfelder v. Sumner*, 860 F.2d 328, 331 (9th Cir. 1988) and *Bell*, 441 U.S. at 559). However, the Supreme Court did not refer to these factors in *Florence*, its most recent case addressing prison policies affecting Fourth Amendment privacy rights in the context of pretrial detainees, nor did the Sixth Circuit reference these factors in *Williams v. City of Cleveland* that addressed the same. Significantly, the Sixth Circuit did not reference these factors in its recent decision regarding a convicted prisoner's Fourth Amendment constitutional claims regarding strip searches in *Stoudemire v. MDOC. See Stoudemire*, 705 F.3d at 572 (quoting and applying the *Bell* "test of reasonableness" that a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the jurisdiction for initiating it, and the place in which it is conducted."). Therefore, the Court does not rely upon the *Cornwell* framework in its analysis but uses the more recent balancing of factors as first espoused by the Supreme Court in *Bell v. Wolfish*, and explained in *Florence*, *Stoudemire,* and *Williams*.

a. Scope, Manner and Location

Plaintiffs argue that the scope and manner of the chair portion of the strip search was overly invasive because such a search was a "body cavity search" that was performed in view of other inmates, by officers of the opposite gender and while they sat on a dirty chair. Defendants, on the other hand, argue that similar visual body cavity searches of prisoners in which there is no physical touching by an inspecting official have been upheld as constitutional by the Supreme Court. *See Bell*, 441 U.S. at 558 n. 39 (noting the search at issue involved the visual inspection of body cavities but there was no touching by any official); *see also Florence*, 132 S. Ct. at 1515-17 (holding a policy that a visual body cavity search (and compelled delousing) of persons charged with non-indictable offenses before their admission to the general population of the facility did not offend the Fourth Amendment and describing the term "strip search" as "imprecise" and noting that in that particular case the term "does not include any touching of unclothed areas by the inspecting officer. There are no allegations that the detainees here were touched in any way as part of the searches."); *see also Goff v. Nix*, 803 F.2d 358, 364-65 (8th Cir. 1986) (holding visual body cavity searches performed every time an inmate entered or left the maximum security prison was reasonable).

As an initial matter, the Court notes that Plaintiffs' arguments improperly conflate the meaning of a "body cavity search" and a visual "strip search". While the definition of a strip search or body cavity search can be imprecise, the MDOC policies define the terms with specificity. MDOC policy 04-04-110 provides that a "body cavity" search is one in which requires reasonable suspicion that the prisoner is harboring contraband, "involves physical intrusion into a body cavity by the person conducting the search", and requires the search to be

30

conducted by a licensed physician.  (Ex. C-1, PD 04-04-110 (eff. 4/24/09), at ¶¶ G(4), X).  While a "strip search" is defined in the same policy as including a "visual inspection of the entrance to the vagina and rectal cavity ...".  (*Id.* at ¶ G(3)).  In the instant case, there are no allegations that the officers physically touched the Plaintiffs, rather, the chair portion of the strip search was a *visual* search of the Plaintiffs' body cavities, consistent with the MDOC policy.  Therefore, Plaintiffs' attempt to cast the chair portion of the strip search policy as a "body cavity search" is not supported by the record or the MDOC policy itself.

However, this does not end the Court's inquiry.  Here, Defendants' arguments that the chair portion of the strip search was reasonable because other courts have found that nonphysical strip searches are constitutional disregard the real thrust of Plaintiffs' claims - that the *manner* of the strip searches as performed were unreasonable.

In the present case, Plaintiffs' allegations are factually distinct from those set forth in *Bell* or *Florence*.  Here, the visual body cavity search at issue required that the prisoners sit on a dirty chair and manipulate their own vaginas at the direction of the officers and in full view of other prisoners.[8]  (Compl. ¶ 19(b)).  While true that there may be a valid penological reason to justify a visual body cavity search, the "manner in which the searches were conducted must itself pass constitutional muster."  *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (holding a plaintiff's claim regarding strip searches that were allegedly conducted daily, at times in front of other prisoners, the guards did not change their latex gloves between searches should have gone to the jury); *see also Hutchin v. McDaniel*, 512 F.3d 193, 196 (5th Cir. 2007) ("[T]he Fourth

---

[8] Plaintiffs argue in their Response brief that the searches were also done in fully view of "officers of the opposite sex."  (Pls.' Resp. at 4, 5, 10, 16, 17).  Additionally, Plaintiffs argue that they were subject to derogatory remarks during the chair portion of the strip search.  (Pls.' Resp. at 1).  However, Plaintiffs do not allege any of these particular facts in their Complaint.

Amendment protects prisoners from searches and seizures that go beyond legitimate penological interests.  Searches of prisoners must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed.") (internal citation omitted)).  Indeed, the Sixth Circuit has explained that "if the search is conducted in a particularly invasive manner, despite the lack of exigent circumstances that necessitate the degree of invasion to which the detainee is subjected, then the search may be unreasonable by virtue of the way in which it is conducted." *Williams*, 771 F.3d at 952 (citing *Stoudemire*, 705 F.3d at 574).

Additionally, Plaintiffs have alleged in their complaint that these strip searches took place in the presence of other prisoners.  (Comp. at ¶ 19).  The Sixth Circuit has held that a visual strip search is "an offense to the dignity of the individual" and is "undoubtedly humiliating and deeply offensive to many".  *Stoudemire*, 705 F.3d at 572-73 (citations omitted). The Sixth Circuit has also recognized that where a strip search is preformed in the presence of others, such a strip search is considered "more invasive" than one conducted in private.  *Id*. at 953 (quoting *Stoudemire*, 705 F.3d at 573 and collecting other cases).

Therefore, given the facts in this limited record, the Court finds that the chair portion of the strip search, if conducted in the presence of others, as alleged by Plaintiffs represents a significant incursion into the Plaintiffs' privacy.

b.       Justification

The Court now turns to the justification for the chair portion of the strip search.  Plaintiffs appear to concede that Defendants had a general legitimate penological interest for conducting a visual strip search of prisoners after contact visits (*see* Pls.' Resp. at 17, "[t]he assumption that prisoner searchers are initiated to detect and deter contraband cannot be ignored; indeed, MDOC

32

may have a legitimate penological interest in searching, even strip searching, inmates after contact visits.").  Defendant Warren provides that routine strip searches on inmates after contact visits is a "necessary tool" in the management of a prison and the goal of these strip searches is to prevent contraband items (i.e. weapons, drugs, money, jewelry, and cell phones) from being smuggled into the prison.  (Warren Aff. at ¶ 5).  Further, Defendant Warren explained that the chair portion of the strip search was instituted because the MDOC was aware that female prisoners could hide contraband in their vaginas and because the MDOC, "at the time, believed that incorporating a chair into the routine strip search procedure would aid staff in performing a more thorough search for contraband and to better comply with MDOC policy on strip searches." (Warren Aff. ¶ 8).  Moreover, Plaintiffs also do not argue in their brief that the chair portion of the strip search was unconstitutional merely because the policy did not require particularized or individualized suspicion.  (*See* Pls.' Resp. at 16).  Plaintiffs' tacit concession of these issues is supported by the fact that "[u]nquestionably, 'detect[ing] and deter[ing] the possession of contraband' is a legitimate penological objective."  *Stoudemire*, 705 F.3d at 573 (quoting *Florence*, 134 S. Ct. at 1517).

As the Sixth Circuit has recently instructed, however, "the pertinent question" is whether the Defendants' "selection of the particular procedures to which it subjected plaintiffs is reasonably related to that legitimate end".  *Williams*, 771 F.3d at 954 (citation omitted).  In the present action, Plaintiffs claim that the chair portion of the strip search was overly invasive and an exaggerated response to "considerations of institutional security".  (Pls.' Resp. at 17).

In *Williams* the Sixth Circuit found that "a correctional institution will have little need to conduct the search or seizure in a particular manner if there are "obvious, easy alternatives ...

33

that fully accommodate[] the prisoner's rights at *de minimis* cost' to the institution's valid penological interest underlying the search in the first place." *Williams*, 771 F.3d at 954 (quoting *Turner*, 482 U.S. at 90-91). In the present action, Plaintiffs argue that the chair portion of the strip search an exaggerated response to any security issue because the prisoners were already made to bend over, spread their buttocks and cough during a routine strip search. Morever, Plaintiffs note that the cough and bend portion of the strip search is an example of an alternative, less invasive means by which the goals of the strip search could be accomplished. It is undisputed that the cough and bend procedure was used prior to 2009 when the inmates were not subject to the chair portion of the search, is used currently, and was also used in addition to the challenged chair portion of the strip search during 2009 and 2011.

The Court further notes that the December 2011 Memo provides that during the time period the chair portion of the strip search was officially authorized only one piece of contraband was discovered, and that contraband was found pursuant to the bend procedure - not the chair portion of the search. (*See* 12/14/11 Memo, at 10). Finally, Defendants' December 2011 Memorandum notes that pursuant to its own survey of guards who performed the search, 75% of the guards surveyed did not believe it was necessary, and 100% of the guards surveyed believed they could conduct the strip search effectively without the chair portion of the search. (*Id.* at 10).

     c.     Weighing the Factors

A regulation that infringes upon a prisoner's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Florence*, 132 S. Ct. at 1515 (citation omitted). Here, Plaintiffs have asserted that the chair portion of the strip search was carried out in an unreasonable manner because prisoners were made or are still made to sit on dirty chairs, in

34

full view of other prisoners, directed to manipulate their own vaginas and such a search was needless and gratuitous because the strip search already involved a bend and cough procedure that accomplished the same goals and was just as effective.  Defendants argue simply that they have a strong interest in ensuring dangerous contraband is kept out of their prisons and rely upon the well settled precept that a court should generally defer to the needs of prison administration. *See Bell*, 441 U.S. at 547.  However, the Sixth Circuit has recently reaffirmed that "we must not confuse deference with abdication."  *Williams*, 771 F.3d at 951 (quoting *Stoudemire*, 705 F.3d at 572)).

Given these facts and weighing the *Bell* factors, the Court finds that Plaintiffs have raised a genuine issue of material fact at this stage regarding whether the chair portion of the strip search was conducted in a reasonable manner.  Indeed, Plaintiffs' allegations raise a genuine issue of material fact regarding whether the chair portion of the strip search as conducted on these particular persons was reasonably related to a legitimate penological interest and where it may have been gratuitous or duplicative of measures already in use.

C.      Clearly Established Law

"Once a court finds a constitutional violation, it must next consider whether 'the right was clearly established at the time of the alleged violation.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 324 (6th Cir. 2015) (quoting *Campbell v. City of Springboro*, 700 F.3d 779, 786 (6th Cir. 2012)).  A constitutional right is clearly established if "[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violated that right."  *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011) (citation omitted).

35

Defendants briefly argue that they are entitled to qualified immunity because the Plaintiffs cannot cite to case in which a court established that a strip search performed by an officer of the same sex "employing the use of a chair for a portion of the strip search" was unconstitutional. (Defs.' Br. at 16). The Court rejects Defendants' argument as construing the constitutional right at issue too narrowly. Indeed, in determining whether a clearly established right exists, "there need not be a case with the exact same fact pattern or even 'fundamentally similar' or 'materially similar' facts; rather, the question is whether the defendants had 'fair warning' that their actions were unconstitutional.'" *Goodwin*, 781 F.3d at 324 (quoting *Cummings v. City of Akron*, 418 F.3d 676, 687 (6th Cir. 2005)).

Tellingly, in *Stoudemire*, the Sixth Circuit rejected a similar attempt to narrowly construe the contours of a 'clearly established right' where the defendant official argued that a prisoner had no right to be free from a same-sex strip search under the Fourth Amendment. *Stoudemire*, 705 F.3d at 574-75. In *Stoudemire*, the Sixth Circuit noted that "it was clearly established that suspicionless strip searches were permissible as a matter of constitutional law, only so long as they were reasonable under the circumstances and performed pursuant to a legitimate penological justification." *Id*. at 575. The Sixth Circuit concluded that the right implicated was the "well established right, the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest." *Id*.

In the instant case, Plaintiffs have identified a similar well established right to be free from a strip search that was performed in full view of other prisoners. *See Id*. Viewing the facts in a light most favorable to Plaintiffs, the Court finds that such a right was well-established in

36

2009, where earlier case law clearly instructs that a strip search must be reasonably related to a legitimate penological purpose <u>and</u> that the manner of that search also be reasonable.  *See Bell*, 441 U.S. at 559-60.  Here, the Court finds that a reasonable officer would have known that a strip search performed in front of other prisoners was not related to a legitimate penological interest. The Sixth Circuit held in *Williams* that it has been a "long-standing rule" that a strip search "even if it does not need to be based upon individualized suspicion, still 'must be conducted in a reasonable manner.'" *Williams*, 771 F.3d at 951 (quoting *Bell*, 441 U.S. at 560)); *see also Cornwell*, 963 F.2d at 917.

As the Court has already found that a genuine issue of material fact exists as to whether the chair portion of the strip search was conducted in a reasonable manner or reasonably related to a legitimate penological purpose, the Court must deny Defendant Warren qualified immunity.

C.       Possible Prospective Relief regarding the Chair Portion of the Strip Search

Plaintiffs assert in their Response that they seek prospective injunctive relief against the MDOC (and the individual Defendants in their official capacity), and request that the MDOC cease the practice of the chair portion of the strip search.  (Pls.' Resp. at 12).

Defendants respond that the routine practice of the chair portion of the strip search was explicitly abandoned as of December 2011 and therefore argue that any request for prospective injunctive relief regarding the policy is moot.  However, Plaintiffs argue that they have been subjected to the chair portion of the strip search <u>after</u> the policy change and that the practice is still currently being used at WHV.  (Compl. ¶ 30).  Plaintiffs also supply the Court with affidavits from the Plaintiffs which state that each Plaintiff suffered the search at issue after the date Warren abolished the "routine" practice.  Plaintiffs further claim that 500 grievances have

37

been filed objecting to the search practice and some (it is unclear how many) were filed after the chair portion of the strip search was allegedly abolished as a "routine" practice.  (Pls.' Br. Ex. 4, Appendix).  Viewing the facts in the light most favorable to Plaintiffs, as the Court must at this stage in the litigation, Plaintiffs' allegations of on-going strip searches which involve the use of a chair allow the Court to conclude that these searches are on-going and that the possibility of prospective relief remains viable.

Therefore, the Court rejects Defendants' argument that Plaintiffs' request for prospective injunctive relief is moot and denies summary judgment in this regard.

## IV. CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss and for Summary Judgment based on Qualified Immunity (ECF No. 11).  Therefore, the Court:

(1)   GRANTS Defendants' Motion and DISMISSES the Eighth Amendment claims against Defendants Warren, Heyns, Finco, Straub, and Treacher in their individual capacity based on qualified immunity;

(2)   GRANTS Defendants' Motion and DISMISSES Plaintiffs' Fourteenth Amendment Due Process claims against ALL Defendants;

(3)   GRANTS Defendants' Motion and DISMISSES the Fourth Amendment claims against Defendants Heyns, Finco, Straub, and Treacher in their individual capacities based on qualified immunity;

(4)   DENIES qualified immunity to Defendant Warren in her individual capacity on these individual Plaintiffs' Fourth Amendment claims; and

(4)    DENIES Defendants' Motion to the extent they argue these individual Plaintiffs' claims for prospective relief are moot.

s/Paul D. Borman_____
PAUL D. BORMAN
Dated:  May 1, 2015                              UNITED STATES DISTRICT JUDGE

38

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 1, 2015.


s/Deborah Tofil
Case Manager