UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM and KESHUNA
ABCUMBY,

               Plaintiffs,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

               Defendants.

_____/

Case No. 13-14567

Paul D. Borman
United States District Judge

R. Steven Whalen
United States Magistrate Judge

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND QUALIFIED IMMUNITY, AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This is a putative class action concerning certain strip search practices that were employed at the Women's Huron Valley Correctional Facility, operated by the Michigan Department of Corrections ("**MDOC**"). Named Plaintiffs Amira Salem and Keshuna Abcumby, both former inmates there, filed suit against the Michigan Department of Corrections, Warden Millicent Warren, and four other state officials, alleging that the inmate strip search procedures used by officers at the facility violated their rights under the Fourth, Eighth, and Fourteenth Amendments.

In May 2015, this Court dismissed Plaintiffs' Eighth and Fourteenth Amendment claims against all Defendants, and Plaintiffs' Fourth Amendment claims against all Defendants except Defendant Warren, concluding that Defendant

Warren was not entitled to qualified immunity on that claim. The issue of prospective injunctive relief against MDOC was not raised in this count.

Defendants appealed this Court's ruling denying qualified immunity to Defendant Warren to the United States Court of Appeals for the Sixth Circuit, which affirmed that ruling. *See generally Salem v. Michigan Dep't of Corr.*, 643 F. App'x 526 (6th Cir. 2016) (available on the docket at ECF No. 32). The Sixth Circuit noted that Defendant Warren had not raised at the District Court the issue that there were no facts supporting her personal involvement in any searches done in public view and that MDOC policy forbade guards from searching in such a manner. *See id.* at 530. In December 2016, this Court denied Plaintiffs' class certification motion without prejudice.

The remaining issues are whether Defendant Warren is entitled to summary judgment on the claim that strip searches were performed in view of others, and whether Plaintiffs are entitled to future injunctive relief against MDOC.

Presently before the Court are Defendants' Motion for Summary Judgment and Qualified Immunity, as well as Plaintiffs' Motion for Partial Summary Judgment.

# I.    BACKGROUND

## A.    Factual Background

### 1.    Chair-based Strip Searches at the Women's Huron Valley Correctional Facility

Prior to 2009, a standard strip search at a correctional facility that housed female prisoners in Michigan was conducted by female corrections officers, who would require the prisoner to "remove her clothing [and] bend forward, [to allow] for a visual inspection of the entrance to the vagina and rectal cavity; in such cases, the [prisoner would] be required to bend and spread her buttocks, and cough." (ECF No. 21, May 2015 Opinion and Order[1] at 3, Pg ID 241 (internal quotation marks omitted) (citing ECF No. 11 Ex. A, January 2014 Affidavit of Millicent Warren ¶ 6).) "The female [corrections officer] then performed a visual check of the inmate's mouth, nose, ears, hair and asked the prisoner to allow the officer clear view of areas behind ears and under breasts." (*Id.* (alteration in original) (internal quotation marks and citation omitted).)

Defendant Millicent Warren became warden of MDOC's Huron Valley complex in October 2008. (ECF No. 65, Defs.' Mot. Summ. J. Ex. A, Deposition of

---

[1] The factual summary in this section is drawn in part from this Court's May 1, 2015 Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and for Summary Judgment Based on Qualified Immunity. *See generally Salem v. Michigan Dep't of Corr.*, No. 13-14567, 2015 WL 1966727 (E.D. Mich. May 1, 2015) (available on the docket at ECF No. 21). There is no apparent dispute as to the facts set forth herein that are drawn from the May 2015 Opinion and Order.

Millicent Warren at 39:25-40:2.) At some time prior to that, MDOC had instituted the use of a chair to aid corrections officers in performing strip searches on female inmates, in certain circumstances, in the East Side of the facility. (May 2015 Opinion and Order at 3-4, Pg ID 241-42.) After MDOC consolidated all of its female prisoners into the Huron Valley facility—now known as the Women's Huron Valley Correctional Facility ("**WHV**")—in 2009, *id.*, MDOC also implemented the chair-based strip searches on the West Side of the facility. (ECF No. 18 Ex. A, March 2014 Supplemental Affidavit of Millicent Warren ¶ 4.)

As to the specifics of the chair-based strip searches, a WHV Operating Procedure dated May 1, 2009 (and hereinafter referred to as "**WHV-OP-04.04.110**"[2]) defined the general term "strip search" as follows:

---

[2] WHV-OP-04.04.110, an Operating Procedure specific to WHV, implemented the more general MDOC Policy Directive 04.04.110 (hereinafter "**PD 04.04.110**"), entitled "Search and Arrest in Correctional Facilities." Warren clarified the difference between Policy Directives and Operating Procedures in her September 21, 2017 deposition, explaining that Policy Directives represent MDOC's "position on . . . any particular topic," while an Operating Procedure "tells you how to do that, how do you accomplish that goal." (Warren Dep. 11:8-15.) The record suggests that different versions of PD 04.04.110 have been in effect at different times, but there is no apparent dispute that PD 04.04.110 and WHV-OP-04.04.110 represent the relevant formal policy documents in this case.

Warren further testified in her deposition that within the grievance procedures available to WHV inmates at the relevant time, inmates could file grievances concerning formal MDOC or WHV policies like those discussed above, but that such grievances were necessarily denied because inmates "cannot grieve policy." (Warren Dep. 8:5-22.) On the other hand, inmates could grieve implementation of policy— i.e., not following it—as Warren testified:

4

Strip Search: Visual inspection of all body surfaces of a person who has been required to remove all or most of his/her clothing and jewelry for purposes of the search. This includes visual inspection of the mouth, ears, and nasal cavities. Unless determined by the Warden to be unnecessary for an assignment within the security perimeter which requires a strip search (e.g., Michigan State Industries), it also includes visual inspection of the entrance to the vagina and rectal cavity; in such cases, the person will be required to bend and spread her buttocks and sit on a sanitary paper lined chair and spread her knees so as to spread the lips of her vagina to allow inspection. All clothing and articles which are removed also shall be inspected for contraband.

(ECF No. 11 Ex. A, Jan. 2014 Warren Aff. Ex. C-2, WHV-OP-04.04.110 at 3, Pg

ID 129 (emphasis in original).) Importantly, WHV-OP-04.04.110 also provides that

---

Q. . . . I think you testified earlier that prisoners can't grieve a policy itself, meaning they can't file a grievance to say, "Hey, I don't like strip searches. I think they violate my rights. I'm filing this grievance." That would be rejected under that MDOC policy?

A. That's correct.

Q. Okay. But if a prisoner had a problem with the way a policy was implemented and believed it went outside the scope of it, that's grievable, isn't it?

A. Yes, it is.

Q. Okay. So if an officer stepped outside the bounds of what they're supposed to do, they could grieve it; correct?

A. That's correct.

Q. So if an officer were performing a strip search and left the door open and could see a bunch of people out in the hallway, even though he did everything right with the chair strip . . . search in every other fashion except that, the prisoner would have a right to grieve that, wouldn't they?

A. That's correct.

(Warren Dep. 50:14-51:9.)

"[a] strip search of a prisoner at WHV must be conducted by and only in the presence of female employees." (*Id.* at 4, Pg ID 130.)

These types of searches were performed after a prisoner returned from an off-site visit (including hospital visits or leaving the prison on writ), and after each "contact visit" (*i.e.*, visits in which a prisoner was allowed physical contact with her visitors). (May 2015 Opinion and Order at 4, Pg ID 242.) Warren averred in a sworn affidavit that the decision to use the chair portion of the strip search was an attempt "to better comply with the search depicted in the 1998 training video which showed how a proper strip search of female offenders was to be done. The additional step of using a chair was added because of the awareness that females could hide contraband in their vagina." (*Id.* (internal quotation marks omitted) (quoting Jan. 2014 Warren Aff. ¶ 8).) Warren further averred that "MDOC, at the time, believed that incorporating a chair into the routine strip search procedure would aid staff in performing a more thorough search for contraband and to better comply with MDOC policy on strip searches." (*Id.* at 4-5, Pg ID 242-43) (internal quotation marks and citation omitted).)

The 1998 training video includes a visual depiction of how to conduct a strip search pursuant to PD 04.04.110, and instructs that during a routine strip search the female inmate is "required to sit and spread the lips of her vagina." (*Id.* at 5, Pg ID 243 (citing Jan. 2014 Warren Aff. Ex. B, Video).) The training video further advises

that any tampon or sanitary napkin must be removed to allow the corrections officer to visually search the vaginal opening, but is silent as to the maintenance of sanitary conditions and as to the prevention of the spread of communicable disease. (*Id.* (citing Jan. 2014 Warren Aff. Ex. B, Video).)

Warren testified that the initial decision to institute the chair portion of the strip search in the Huron Valley complex was not hers, as it was being used on the East Side of the facility before she became warden. (Warren Dep. 40:18-41:6.) Warren also testified as to how searches like this were to be carried out: specifically, she testified that they were required to be conducted in a windowless room by female officers, and that only the officer performing the search was allowed to be present in the room with the inmate unless another officer was also present for training purposes. (Warren Dep. 49:12-25.) Like all strip search procedures, strip searches involving a chair were to be conducted one at a time, out of view of other prisoners. (Warren Dep. 50:1-13.)

Warren provided further testimony regarding the administration of chair-based strip searches in a sworn affidavit dated December 14, 2017. (Defs.' Mot. Summ. J. Ex. B, December 2017 Affidavit of Millicent Warren, Pg ID 706-10.) In that affidavit, she averred, consistently with the language of WHV-OP-04.04.110 quoted above, that the policy required any strip search to be conducted "by and only in the presence of female employees." (Dec. 2017 Warren Aff. ¶ 3 (quoting WHV-

7

OP-04.04.110 at 4, Pg ID 130).) She then averred as follows:

> At no time did I give instruction to staff to violate these policies in any way. I did not encourage staff to conduct strip searches of prisoners in view of other prisoners or to conduct strip searches in an unsanitary manner. I did not participate directly in conducting strip searches of prisoners in view of other prisoners or to conduct strip searches in an unsanitary manner. I did not implicitly authorize, approve or knowingly acquiesce in staff conducting strip searches of prisoners in view of other prisoners or to conduct strip searches in an unsanitary manner.

(*Id.*)

## 2.     Inmate Complaints and Subsequent Policy Changes

During 2010 and 2011, MDOC personnel (including Warren) became aware of complaints from inmates at WHV regarding the chair strip search. (May 2015 Opinion and Order at 6, Pg ID 244.) The parties differ over the precise number of such complaints, but there is no dispute that MDOC received at least 67 grievances regarding some aspect of the chair strip search between 2009 and 2011, and that WHV's psychological services staff received at least 30 complaints regarding the same (with possible overlap between the two groups). (*See id.* at 6-7, Pg ID 244-45.)

Complaints about WHV's strip search procedures were also raised by WHV inmates at Warden's Forum Committee ("**WFC**") meetings, which Warren conducted periodically in order to share news with the inmate population and to allow inmates to discuss issues of concern to them. (Warren Dep. 12:20-13:6.) Minute records from four WFC meetings (three in 2009 and one in early 2011)

8

reflect that WHV inmates raised various complaints about the strip search procedures at those meetings, including, *inter alia*, complaints that the procedures were unhygienic, required some inmates to violate their own religious practices, and could be traumatic to prisoners with histories of sexual abuse. (Warren Dep. Exs. 8-11, Pg ID 882-900.)

In response to these grievances and complaints, Warren began an administrative fact finding and review process to evaluate the necessity of the chair strip search. (*Id.*) Ultimately, on June 3, 2011, Warren issued a memorandum amending the relevant language in WHV-OP-04.04.110. The newly amended WHV-OP-04.04.110 contained the same definition of "Strip Search" as quoted above, but added the following language directly after that definition:

> NOTE: If necessary, the prisoner may be required to manually spread the lips of her vagina with her hands. If this procedure is necessary, the prisoner will be allowed to sanitize their hands before and after this procedure with an approve[d] sanitizer.

(May 2015 Opinion and Order at 7-8, Pg ID 245-56 (quoting ECF No. 11 Ex. B, June 2011 Memorandum at Pg ID 154).) Warren stated in the June 3, 2011 memorandum that "[t]here is now an approved sanitizer located in each strip search room and [it] shall be available whenever a strip search needs to be performed and the prisoner is required to 'manually spread the lips of her vagina with her hands'." (*Id.* (quoting June 2011 Memorandum at Pg ID 154).)

9

On December 14, 2011, Warren issued a second memorandum regarding WHV search procedures, specifically addressing the issue of whether the "chair portion of the regular post contact visit strip search [should] be continued as a matter of routine." (*Id.* at 8-9, Pg ID 246-47 (quoting Jan. 2014 Warren Aff. Ex. A, December 2011 Memorandum at 1, Pg ID 99).) In the December 14, 2011 memorandum, Warren recounted the history of the chair portion of the strip search, stating that the chair portion of the strip search was "instituted in an effort to operate the facility in complete accord with MDOC policy" and referring to the 1998 training video. (*Id.* at 9, Pg ID 247 (internal quotation marks omitted) (quoting December 2011 Memorandum at 1-2, Pg ID 99-100).) Warren also explained in the memorandum that the "MDOC Central Office, after discussion with the WHV warden, decided the use of the chair and visual inspection of the vaginal opening was an important part of the strip search of female prisoners after contact visits." (*Id.* (internal quotation marks omitted) (quoting December 2011 Memorandum at 2, Pg ID 100).) The memorandum then addressed six factors that Warren considered in determining whether to continue the chair portion of the routine strip search: (1) the results of random drug tests administered in 2010 and 2011; (2) comments from the facility's mental health staff; (3) prisoner grievances concerning the chair portion of the strip search; (4) the extent to which prisoners had availed themselves of a "non-contact visit" option to avoid having to undergo the chair portion of the strip search;

10

(5) the results of a survey administered to corrections officers who had performed the chair portion of the strip search; and (6) the number of instances in which a strip search had revealed contraband hidden on an inmate's person since the chair portion of the strip search was implemented. (*See id.* at 9-11, Pg ID 247-49.) Warren summarized her conclusion as follows:

> [o]n balance the increased security benefit provided by the use of the chair portion of the strip search, on the present data may not be sufficiently great to require, even though it allows, the modest stressor of continued use of the chair portion of the routine post contact visit strip search .... the chair portion of the strip search appears viewed by both prisoners and the staff conducting the strip searches as an unnecessary irritation. Therefore, I have decided to suspend the routine use of the chair portion of the strip search following contact visits effective Friday, December 16, 2011.

(*Id.* at 11-12, Pg ID 249-50 (alteration in original) (quoting December 2011 Memorandum at 14-15, Pg ID 112-13).)

## B.  Procedural History

Plaintiffs filed this putative class action on November 1, 2013, seeking relief for conduct at WHV "during the last three years." (ECF No. 1, Compl. ¶ 1.) Plaintiffs asserted two substantive claims in their Complaint: violation of the Eighth Amendment's prohibition on cruel and unusual punishment (Count I), and violation of Plaintiffs' privacy and due process rights under the Fourth and Fourteenth Amendments (Count II). Plaintiffs brought the action against Warren, MDOC, and four other MDOC employees (sued, like Warren, in both their official and individual

11

capacities) whom Plaintiffs alleged were in some way responsible for the implementation of the chair portion of the strip search. In the Complaint, Plaintiffs requested certification of the lawsuit as a class action pursuant to Federal Rule of Civil Procedure 23, as well as various forms of injunctive, declaratory, and other legal relief. (*See* Compl. at 14, Pg ID 14.)

## 1. Defendants' Motion to Dismiss and for Summary Judgment

On January 21, 2014, Defendants filed a Motion to Dismiss and for Summary Judgment Based upon Qualified Immunity. (ECF No. 11.) Plaintiffs filed a Response on March 11, 2014 (ECF No. 17), and Defendants filed a Reply on March 25, 2014 (ECF No. 18). The Court conducted a hearing on Defendants' Motion on June 26, 2014.

On May 1, 2015, the Court entered an Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and for Summary Judgment Based upon Qualified Immunity. *See generally Salem v. Michigan Dep't of Corr.*, No. 13-14567, 2015 WL 1966727 (E.D. Mich. May 1, 2015) (available on the docket at ECF No. 21). This Court first noted that both parties relied on evidence outside of the pleadings in their briefs, and thus made clear that "to the extent that this Court relies upon Defendants' and Plaintiffs' proffered evidence, the Court construes Defendants' motion as one for summary judgment under FED. R. CIV. P. 56(a)." (May 2015 Opinion and Order at 14, Pg ID 252.)

Turning to the merits, the Court first held that "Plaintiffs' claims insofar as they seek money damages against the MDOC or against the individual defendants sued in their official capacity are barred by the Eleventh Amendment." (*Id.* at 15, Pg ID 253.) The Court then addressed the merits of the constitutional claims that Plaintiffs had asserted under 42 U.S.C. § 1983. First, the Court found that Plaintiffs had "failed to differentiate any possible Fourteenth Amendment due process claim from their Fourth or Eighth Amendment claim" either in their Response to Defendants' Motion or at oral argument, and had therefore "abandoned any due process claim pursuant to the Fourteenth Amendment arising under the facts alleged in this action." (May 2015 Opinion and Order at 18, Pg ID 256 (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)).) As to Plaintiffs' Eighth Amendment claim, the Court held that the four individual Defendants besides Warren were entitled to qualified immunity because Plaintiffs had failed to plead or argue any specific personal involvement by those Defendants in the search procedures at issue. The Court then found that Warren herself was entitled to qualified immunity because Plaintiffs could not show that she had violated the Eighth Amendment in light of Warren's "knowledge of prisoner's complaints, her inquiry [into] the matter, her actions to make the search sanitary, and her direction that prisoners could choose to avoid the chair portion of the search by foregoing contact visits, and her formal abandonment of the policy." (*Id.* at 25, Pg ID 263.)

13

As to Plaintiffs' Fourth Amendment claims, the Court held that the four individual Defendants besides Warren were entitled to qualified immunity as to those claims for the same reason that they had qualified immunity as to Plaintiffs' Eighth Amendment claims: Plaintiffs' "fail[ure] to differentiate the individual conduct of [those] Defendants." (*Id.* at 27, Pg ID 265 (citing *Roth v. Guzman*, 650 F.3d 603, 609 (6th Cir. 2007)).)

By contrast, Defendant Warren was denied qualified immunity on Plaintiffs' Fourth Amendment claims. This Court first explained that the appropriate inquiry was to "balance the need for the particular search against the invasion of prisoners' personal rights and to this end, 'consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.'" (*Id.* at 29, Pg ID 267 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).) As to the invasiveness of the search, the Court cited Sixth Circuit case law holding that strip searches conducted in the presence of others are "more invasive" than those conducted in private (*see id.* at 32, Pg ID 270 (quoting *Williams v. City of Cleveland*, 771 F.3d 945, 953 (6th Cir. 2014)), and therefore found "that the chair portion of the strip search, if conducted *in the presence of others*, as alleged by Plaintiffs represents a significant incursion into the Plaintiffs' privacy." (*Id.* (emphasis added).) Then, the Court determined that notwithstanding Defendants' "general legitimate penological interest for conducting a visual strip search of

14

prisoners after contact visits," there was little evidence that the chair portion of the strip search procedure specifically furthered that interest in ways that standard strip searches did not. (*Id.* at 32-34, Pg ID 270-72.) Accordingly, the Court held that Plaintiffs' allegations raised "a genuine issue of material fact regarding whether the chair portion of the strip search as conducted on these particular persons was reasonably related to a legitimate penological interest and where it may have been gratuitous or duplicative of measures already in use." (*Id.* at 35, Pg ID 273.)

The Court then rounded out the qualified immunity inquiry by addressing the issue of whether the constitutional right that was allegedly violated "was 'clearly established' at the time of the challenged conduct.'" (*Id.* at 26, Pg ID 264 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).) In that regard, the Court found that because pre-2009 case law "clearly instructs that a strip search must be reasonably related to a legitimate penological purpose and that the manner of that search also be reasonable[,] . . . a reasonable officer would have known that a strip search performed in front of other prisoners was not related to a legitimate penological interest." (*Id.* at 37, Pg ID 275 (internal citations omitted) (collecting authorities).) The Court therefore denied qualified immunity to Defendant Warren.

Finally, the Court took up Defendants' argument that the injunctive relief Plaintiffs sought—specifically, their "request that the MDOC cease the practice of the chair portion of the strip search"—was moot because the chair portion of the

15

strip search was formally discontinued as a "routine practice" in December 2011. (*Id.* at 37-38, Pg ID 275-76.) The Court rejected this argument, since Plaintiffs had alleged (and averred in sworn affidavits) that they and other inmates at WHV had "suffered the search at issue after the date Warren abolished the 'routine' practice." (*Id.*) The Court thus concluded that "Plaintiffs' allegations of on-going strip searches which involve the use of a chair allow the Court to conclude that these searches are on-going and that the possibility of prospective relief remains viable." (*Id.*)

### 2.    Defendants' Appeal to the Sixth Circuit

Both parties collaterally appealed the Court's May 1, 2015 Opinion and Order. (ECF Nos. 23, 26.) The Sixth Circuit dismissed Plaintiffs' appeal for lack of jurisdiction on September 8, 2015. (ECF No. 31.)

Approximately six months later, on March 9, 2016, the Sixth Circuit issued an opinion regarding Defendants' appeal, affirming this Court's denial of qualified immunity to Defendant Warren, and dismissing for lack of jurisdiction Defendants' appeal of this Court's determination that Plaintiffs' injunctive-relief claim was not moot. *See generally Salem v. Michigan Dep't of Corr.*, 643 F. App'x 526 (6th Cir. 2016) (available on the docket at ECF No. 32). On the qualified immunity issue, the court rejected Plaintiffs' argument that the lack of individualized suspicion rendered the challenged searches unconstitutional, holding that such an argument was foreclosed by both Supreme Court and Sixth Circuit precedent. (*See id.* at 4 (citing

*Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 330-34

(2012) and *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013)).)

The Sixth Circuit then turned to Warren's argument that the manner in which

the challenged searches were conducted was constitutionally permissible. In

addition, Warren argued that Plaintiffs had failed to show her personal involvement

in any searches performed in public view, and that MDOC policy in fact forbade

guards from conducting searches in this way, but the Sixth Circuit declined to

address this argument because it had not been raised before this Court in the first

instance.

The Sixth Circuit thus confined its inquiry "to whether the searches,

performed in the manner alleged by Plaintiffs, violated their clearly established

Fourth Amendment rights." (*Id.* at 5.) To that issue, the Sixth Circuit applied the

same balancing test that this Court had employed in the May 2015 Opinion and

Order:

> Whether a prison search is constitutionally reasonable depends on
> "whether the jail's 'need for the particular search' outweighs 'the
> invasion of personal rights that the search entails.' " *Williams*, 771 F.3d
> at 950 (quoting *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 60
> L.Ed.2d 447 (1979); *Stoudemire*, 705 F.3d at 572). In making this
> determination, we "consider the scope of the particular intrusion, the
> manner in which it is conducted, the justification for initiating it, and
> the place in which it is conducted," *id.* (quoting *Bell*, 441 U.S. at 559,
> 99 S.Ct. 1861), while also examining "obvious, easy alternatives" that
> accommodate the inmate's privacy interests at little cost to valid

penological objectives, *id.* (quoting *Turner v. Safley*, 482 U.S. 78, 90–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)).

*Salem*, 643 F. App'x at 530. The Sixth Circuit rejected Warren's contention that *Williams* and *Stoudemire* were distinguishable on their facts, finding that the factual differences between those two decisions and this case ultimately

> fail to undercut this court's stance that *searches conducted in view of other inmates*—who "do not share the searching officers' institutional need to view [another prisoner] unclothed"—are exceedingly intrusive. *Williams*, 771 F.3d at 953. Moreover, Plaintiffs pair their public-viewing allegations with claims that guards forced the inmates to "sit naked on an unwashed and unsanitized chair wet with bodily fluids from other prisoners." These aspects of the searches amplify their invasiveness.

*Id.*

As to the justification for the challenged search procedures, the Sixth Circuit acknowledged the importance of MDOC's need to detect and deter the possession of contraband among its inmates, but concluded that those goals "can be met through constitutionally competent searches outside the view of other inmates." (*Id.* at 6 (citing *Stoudemire*, 705 F.3d at 574).) Indeed, the court noted, "the obvious, less invasive alternative is to 'conduct the searches and seizures in private rather than in the presence of other [prisoners].'" (*Id.* (quoting *Williams*, 771 F.3d at 955).) As Warren had made no argument "that this alternative would undermine penological objectives," the Sixth Circuit upheld this Court's judgment "denying qualified immunity to Warren regarding the non-private searches." (*Id.*) Further, the court held

18

that under its own precedents, "'the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others' was clearly established by February 2007—two years before Warren implemented the chair searches at issue." (*Id.* at 7 (quoting *Stoudemire*, 705 F.3d at 575).)

Finally, the Sixth Circuit held that it had no jurisdiction over Defendants' appeal of this Court's decision to allow Plaintiffs' claim for injunctive relief to proceed. In that regard, the court explained that while the collateral-order doctrine permits interlocutory appeals of district-court denials of Eleventh Amendment immunity, Defendants never raised that issue before this Court in the first instance, and so "no 'district court order denying a claim of Eleventh Amendment immunity' exist[ed] for Defendants to collaterally appeal." (*Id.* at 7 (quoting *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993).)

### 3.    Plaintiffs' Motion to Certify Class

After the matter was remanded and the parties had conducted discovery for several months, Plaintiffs filed a Motion for Class Certification on August 11, 2016. (ECF No. 44.) The parties briefed the Motion in full (ECF Nos. 50-51), and this Court held a hearing on the Motion on November 16, 2016. On December 22, 2016, the Court denied Plaintiffs' class certification motion without prejudice. (ECF No. 56, December 2016 Opinion and Order.) The issue of class certification is not dealt with in this Opinion.

19

### 4. Instant Motions

In Defendants' Motion for Summary Judgment and Qualified Immunity (ECF No. 65, Defs.' Mot. Summ. J.), remaining Defendants Warren and MDOC seek summary judgment in two respects: for Warren in her individual capacity based on qualified immunity, and for MDOC itself (as well as for Warren in her official capacity, which amounts to the same thing) with regard to Plaintiffs' request for prospective injunctive relief. Plaintiffs filed a timely Response to Defendants' Motion. (ECF No. 67, Pls.' Resp. Opp'n Summ. J.) Defendants did not file a Reply.

Plaintiffs filed a Motion for Partial Summary Judgment (ECF No. 64, Pls.' Mot. Summ. J.), in which they request that this Court "grant judgment in favor of all Plaintiffs that were strip searched in front of others." (*Id.* at 2, Pg ID 579.) In that Motion, Plaintiffs first summarize the Sixth Circuit's March 2016 decision affirming this Court's denial of qualified immunity to Defendant Warren as well as the precedents on which that decision relied. (*See id.* at 5-10, Pg ID 589-94.) Plaintiffs then represent that "[w]e currently have one hundred and thirty five (135) women who have alleged that they were strip while incarcerated at [WHV] in view of others," and argue that summary judgment should be granted as to those individuals. (*Id.* at 11-14.) Defendants filed a timely Response to Plaintiffs' Motion (ECF No. 70, Defs.' Resp. Opp'n Summ. J.), and Plaintiffs filed a timely Reply (ECF No. 72, Pls.' Reply Supp. Summ. J.).

Each of the Reply briefs that Plaintiffs filed in support of their class certification and summary judgment motions respectively attached the same proposed exhibit: 840 pages of putative affidavits signed by current or former inmates of WHV, asserting that the affiant was subjected to strip search procedures during her term of incarceration under different sets of circumstances. (Pls.' Reply Supp. Summ. J. Ex. A; Pls.' Reply Supp. Class Cert. Ex. A.)

Then, on April 3, 2018—one day before the scheduled hearing on the three pending Motions—Plaintiffs filed, yet again, two identical supplements to those two Reply briefs, each of which contained an attached exhibit of 70 additional pages of putative affidavits. (ECF Nos. 74, 75.)

The Court struck from the record these tardy filings at the hearing on April 4, 2018, the following day, finding that the "document dump" the previous evening was unreasonable and vexatious under 28 U.S.C. § 1927. (ECF No. 76.) Further, the Court noted that the April 3, 2018 document dump came after the 840-page dump on the Court and the Defendant in the February reply brief.

On April 5, 2018, the Court issued an Order Striking Exhibits and Imposing Sanctions stating:

> On February 9, 2018, Plaintiffs filed two reply briefs (ECF Nos. 72, 73): one in support of their previously-filed Motion for Partial Summary Judgment (ECF No. 64), and one in support of their previously-filed Motion for Class Certification (ECF No. 66). Attached as a single exhibit to each of the two reply briefs were 840 pages of

21

putative affidavits by current or former inmates of Michigan Department of Corrections' Women's Huron Valley facility ("WHV"), which Plaintiffs argued evidenced that a substantial number of inmates had been subjected to non-private strip searches while incarcerated at WHV. These putative affidavits were filed in no discernible order and without an index or tabbed pages, and a noticeable proportion of the putative affidavits were either unsigned, duplicative of other putative affidavits in the same exhibit, or not indicative of whether the author had in fact been subjected to non-private strip searches at WHV.

Then, on the evening of April 3, 2018—the day before a scheduled hearing on Plaintiffs' Motion for Class Certification, Plaintiffs' Motion for Partial Summary Judgment, and Defendants' Motion for Summary Judgment (ECF No. 65)— Plaintiffs supplemented each of these exhibits to their reply briefs with an additional 69 pages of putative affidavits that followed the same template. These tardy and unauthorized submissions were presented without justification, were not organized in any apparent fashion, and included putative affidavits duplicative of those contained in the first set. The Court struck these supplemental filings in an Order issued on April 4, 2018. (ECF No. 76.) The Court finds that these late filings violated 28 U.S.C. § 1927 by unreasonably and vexatiously impacting the proceedings.

The Court also finds that the initial set of putative affidavits that were attached as exhibits to Plaintiffs' reply briefs were improper. "[I]t is well-settled that a party may not raise new issues for the first time in a reply brief; he can only respond to arguments raised for the first time in the respondent's response brief." *Resolution Tr. Corp. v. Townsend Assocs. Ltd. P'ship*, 840 F. Supp. 1127, 1142 (E.D. Mich. 1993) (citing *United States v. Jerkins*, 871 F.2d 598 (6th Cir. 1989)).

In light of the sheer volume of Plaintiffs' putative affidavits, the lack of any apparent attempt to organize them or to screen out duplicates, and the fact that Plaintiffs effectively denied Defendants any meaningful opportunity to respond to them by attaching them to their reply briefs, the Court finds that Plaintiffs' conduct as to the putative affidavits needlessly increased the cost of litigation under Federal Rule of Civil

Procedure 11(b)(1) and (c)(3), and unreasonably and vexatiously multiplied the proceedings under 28 U.S.C. § 1927.

Accordingly, as discussed on the record at the April 4, 2018 hearing, the Court orders the exhibits to ECF Nos. 72 and 73 STRICKEN from the record in this case and the images removed from the CM/ECF system.

The Court orders Plaintiffs' counsel to reimburse Defendants' counsel for two hours of labor at a rate of $195 per hour, for a total monetary sanction of $390.

(ECF No. 77.)

On April 18, 2018, Plaintiffs filed a new set of affidavits: 561 pages of affidavits by current and former WHV inmates.

After a hearing on August 1, 2018, the Court struck Plaintiffs' affidavits because Plaintiffs' attorney Kenneth Hardin's submission affidavit was improperly sworn (by a Pennsylvania notary). (ECF No. 86.) The Court also noted on the record that a random check of some affidavits contained inadequate or contradictory statements, contained no statements at all, or fell outside the statute of limitations. This filing too violated 28 U.S.C. § 1927. At the conclusion of the hearing, the Court gave Mr. Hardin two weeks to properly file relevant affidavits. Thereafter, the Court, at Mr. Hardin's request, provided him an additional month for filing.[3] (ECF No. 89.)

---

[3] At this point, the proposed affidavits are not part of the record, and not necessary to the Court's resolution of the instant Motions for Summary Judgment. If they become part of the record subsequently, they will be, of course, relevant to the issue of class certification.

## II.    LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able

24

to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (alterations in original) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

When presented with cross-motions for summary judgment, the Court "must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003). "The fact that the parties have filed cross motions for summary judgment does not automatically justify the conclusion that there are no facts in dispute." *Ely v. Dearborn Heights School Dist. No. 7*, 150 F. Supp. 3d 842, 849-50 (E.D. Mich. 2015) (citing *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). In this context, a plaintiff and a defendant have different burdens:

> In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

> When the moving party also bears the ultimate burden of persuasion, the movant's affidavits and other evidence not only must show the absence of a material fact issue, they also must carry that burden. *Vance v. Latimer*, 648 F.Supp.2d 914, 919 (E.D. Mich. 2009); *see also Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992); *Stat–Tech Liquidating Trust v. Fenster*, 981 F.Supp. 1325, 1335 (D. Colo. 1997) (stating that where "the crucial issue is one on which

the movant will bear the ultimate burden of proof at trial, summary judgment can be entered only if the movant submits evidentiary materials to establish all of the elements of the claim or defense").

The plaintiff therefore "must sustain that burden as well as demonstrate the absence of a genuine dispute. Thus, it must satisfy both the initial burden of production on the summary judgment motion—by showing that no genuine dispute exists as to any material fact—and the ultimate burden of persuasion on the claim—by showing that it would entitled to a directed verdict at trial." William W. Schwarzer, et al., The Analysis and Decision of Summary Judgment Motions, 139 F.R.D. 441, 477-78 (1992) (footnotes omitted).

*Ely*, 150 F. Supp. 3d at 849-50.

Finally, all evidence in opposition to a motion for summary judgment must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009) ("[T]he party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary.").

## III.    DISCUSSION

The Sixth Circuit's March 2016 opinion significantly narrowed the issues in this case. In affirming this Court's denial of qualified immunity to Defendant Warren, the Sixth Circuit explained that its precedent has "held that strip searches performed in view of other inmates without a legitimate penological justification violates inmates' clearly established Fourth Amendment rights." *Salem*, 643 F.

App'x at 530 (citing *Williams*, 771 F.3d at 952–56 and *Stoudemire*, 705 F.3d at 572–75). And while the Sixth Circuit observed that "Plaintiffs pair their public-viewing allegations with claims that guards forced the inmates to sit naked on an unwashed and unsanitized chair wet with bodily fluids from other prisoners" and that such claims also serve to "amplify [the searches'] invasiveness," the court went on to "uphold the judgment of the district court denying qualified immunity to Warren *regarding the non-private searches.*" (*Id.* at 6 (emphasis added).) Thus, "the Sixth Circuit's decision affirmed this Court's holding that Defendant Warren was not protected by qualified immunity *to the extent* that the subject searches were performed in full view of other female prisoners." (December 2016 Opinion and Order at 9, Pg ID 514.) These decisions have made clear that the scope of Plaintiffs' action is now limited to strip searches performed in the presence of individuals other than the officer and the inmate, for whose presence there was no legitimate penological justification.

## A.    Defendants' Motion for Summary Judgment and Qualified Immunity

Defendants make two arguments for summary judgment. First, they argue that Plaintiffs have failed to show that Defendant Warren directly participated in or even tacitly authorized the sort of "non-private searches" that the Sixth Circuit found to be unconstitutional in the March 2016 opinion, and then argue that this precludes liability for Warren under Section 1983 both on the merits and under the doctrine of

27

qualified immunity. Second, they contend that prospective injunctive relief for continuing violations of law is not available to Plaintiffs in this case. As discussed in detail below, the Court, taking the facts in the light most favorable to the non-moving party, finds that fact issues preclude summary judgment on both of these grounds, and will therefore deny Defendants' Motion for Summary Judgment and Qualified Immunity.

### 1. Defendant Warren's Individual Liability

"[T]he § 1983 liability of supervisory personnel must be based on more than the right to control employees. Section 1983 liability will not be imposed solely upon the basis of respondeat superior." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citing *Hays v. Jefferson County*, 668 F.2d 869 (6th Cir. 1982)). "Supervisory liability under § 1983 does not attach when it is premised on a mere failure to act; it 'must be based on active unconstitutional behavior.'" *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). It follows from this that "[a] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). The Sixth Circuit has "interpreted this standard to mean that 'at a

minimum,' the plaintiff must show that the defendant 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'" *Id.* (quoting *Shehee*, 199 F.3d at 300).

In short, "[t]he acts of one's subordinates or the mere failure to act standing alone are not enough to hold a supervisor liable." *Thames v. City of Westland*, 310 F. Supp. 3d 783 (E.D. Mich. 2018) (quoting *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004)). The distinction between implicit authorization or knowing acquiescence, on the one hand, and "mere failure to act," on the other, is not always clear. Still, recent case law provides some guidance as to what may constitute the requisite affirmative conduct on the part of a supervisory official. For example, actively assisting subordinates in covering up constitutional violations after the fact is sufficient. *See Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 542 (6th Cir. 2015) (finding that a plaintiff had sufficient alleged that a defendant sheriff "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate when he helped [subordinate officers] to cover up their unconstitutional actions" by making false statements to federal officials) (internal quotation marks omitted). The Sixth Circuit has also found that a supervisor's failure to properly train subordinates, failure to investigate their constitutional violations, and adoption of a custom of exonerating such violations in a way that effectively gives "the green light" to those who would commit them in

the future can justify liability under Section 1983. *Peatross v. City of Memphis*, 818 F.3d 233, 241-45 (6th Cir. 2016). In addition, "a supervisor may be liable under § 1983 if he abandon[s] the specific duties of his position ... in the face of actual knowledge of a breakdown in the proper workings of the department," provided that "some execution of the supervisors' job function result[s] in [the p]laintiff's injury." *Winkler v. Madison Cty.*, 893 F.3d 877, 898–99 (6th Cir. 2018) (alterations in original) (internal quotation marks and citations omitted). Lastly, supervisory liability may exist where "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and [she] fails to do so," in a way that demonstrates "a causal connection between actions of the supervising official and the alleged constitutional deprivation. . . . The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." *Curran v. City of Dearborn*, 957 F. Supp. 2d 877, 888 (E.D. Mich. 2013) (alteration in original) (internal quotation marks omitted) (quoting *Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002)). *See also Campbell v. City of Springboro, Ohio*, 700 F.3d 779, 790 (6th Cir. 2012) (holding that supervisory liability could be based on a causal connection between a police chief's acts or omissions and constitutional injuries caused by a police dog, where the chief allowed the dog into the field after his training had lapsed, "never required appropriate

supervision of the canine unit and essentially allowed it to run itself," "failed to establish and publish an official K–9 unit policy," was "seemingly oblivious to the increasing frequency of dog-bite incidents," and ignored "many complaints" regarding the need to further train the dog, such that the chief's "apparent indifference to maintaining a properly functioning K–9 unit could be reasonably expected to give rise to just the sort of injuries that occurred").

In the instant case, Defendants argue that Plaintiffs have failed to show that Warren was sufficiently involved in the unconstitutional search practices at issue. Defendants note that at all relevant times, WHV policy "required sanitary napkins to be used on the chair during searches, and that the searches could only be conducted by and in front of female employees." (Defs.' Mot. Summ. J. at 2, Pg ID 613.) As Warren "did not authorize these policies to be violated, did not encourage staff to violate these policies, and did not personally conduct searches in violation of these policies," Defendants maintain, she was not personally involved enough in any improper searches to justify individual liability against her. (*Id.*)

Plaintiffs counter that their evidence does adequately connect Warren to unconstitutional strip searches, in that it demonstrates her knowledge of the constitutional violations and her failure to provide adequate training.[4] In particular,

---

[4] There is some ambiguity based on Plaintiffs' briefs as to whether their argument is that Warren is liable as a policymaker, or that her unlawful conduct was acquiescence to violations by her employees—at times, Plaintiffs appear to argue

they cite Warren's testimony that she was made aware of inmates' complaints regarding strip search procedures through formal grievances, and through discussions at "Warden's Forum Committee" ("**WFC**") meetings, which Warren conducted periodically in order to share news with the inmate population and to allow inmates to discuss issues of concern to them. (Warren Dep. 12:20-13:6.) As exhibits to their Response, Plaintiffs have attached meeting minutes from four WFC meetings—three in 2009 and one in 2011—at which attendees raised issues regarding strip search procedures. (Pls.' Resp. Opp'n Summ. J. Exs. 8-11.) Plaintiffs have also submitted records of four grievances filed by four different inmates regarding the strip search procedures, including one filed by Keshuna Abcumby, one of the two individual Plaintiffs in the case. (Pls.' Resp. Opp'n Summ. J. Exs. 12-15.) Citing all of this, Plaintiffs argue that "the need for training may not have been obvious from the outset, but the pattern of constitutional violations put Defendant

---

both. (*See, e.g.*, Pls.' Resp. Opp'n Summ. J. at 17, Pg ID 788 ("Here, it has been shown that the policymaker was aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of policy implementation.").) To the extent that Plaintiffs' argument is based on formal policies, in any case, it lacks merit. Assuming that Warren exercised sufficient control over those policies to qualify her as a "policymaker," Plaintiffs have cited no provision of PD 04.04.110, WHV-OP-04.04.110, or any other policy that authorized officers to conduct strip-searches on inmates in the presence of other inmates. Indeed, WHV-OP-04.04.110 expressly provided—at least as of May 2009, the date of the earliest version in the record—that any "strip search of a prisoner at WHV must be conducted by and only in the presence of female employees" (WHV-OP-04.04.110 at 3, Pg ID 129), and there is no indication that this rule was later altered, by Warren or anyone else.

Warden on notice that the officers confront the particular situation on a regular basis, and that they often reacted in a manner contrary to constitutional requirements." (Pls.' Resp. Opp'n Summ. J. at 17, Pg ID 788.)

Defendants are correct when they point out that Plaintiffs have offered no direct evidence of Warren's participation in, or even her knowledge of any non-private strip searches conducted in the presence of other inmates at WHV. The four sets of WFC meeting minutes reflect complaints by inmates that the procedures were invasive, that they were unhygienic, that they required some inmates to violate their own religious practices, and that they could be traumatic to prisoners with histories of sexual abuse, but they make no mention of strip searches that were conducted in the presence of other inmates, male corrections officers, or persons not part of the corrections staff. The same is true of the four sets of grievance records submitted by Plaintiffs: they variously relate the individual grievants' mental distress, post-traumatic reactions, feelings of degradation, health and hygiene concerns, and fears of grievance-related retaliation, but they contain no reference to strip searches conducted in the presence of any persons who were not female corrections officers.

Nevertheless, even given this absence of direct proof, the record at this stage contains sufficient evidence on which a reasonable jury could find that Warren implicitly authorized or knowingly acquiesced in a custom of non-private strip searches. This conclusion rests primarily on Plaintiffs' allegation in the Complaint

that Defendants "conduct[ed] spread-labia vaginal searches on numerous female prisoners in full view of one another" (Compl. ¶ 19(b)), *and* on a February 2014 affidavit signed by named Plaintiff Keshuna Abcumby, which Plaintiffs attached to their response to Defendants' initial Motion to Dismiss and for Summary Judgment Based upon Qualified Immunity, filed in early 2014. (ECF No. 17 Ex. 5, Pg ID 207-09.) In that affidavit, Plaintiff Abcumby attested that she was subjected to strip searches involving the "use of an unsanitized chair at least 10 times" in 2011 and 2012, and that "[t]hese searches were done in view of other people." (*Id.* ¶¶ 3, 6, 15.) Based on the foregoing, this Court finds that a reasonable jury could determine that Warren implicitly authorized or knowingly acquiesced in a pattern or custom of constitutionally violative strip searches.

The Court recognizes that Warren testified in her deposition that WHV policy required strip searches to be conducted in private, only in the presence of female corrections officers, and on a one-on-one basis (except in some situations involving trainee corrections officers), and that strip searches were generally conducted in a private room with no window on the door. (Warren Dep. 49:12-50:13.) Warren also averred in her own sworn affidavit that she did not instruct or encourage corrections officers to violate that policy, nor did she "implicitly authorize, approve or knowingly acquiesce in staff conducting strip searches of prisoners in view of other prisoners or to conduct strip searches in an unsanitary manner." (Dec. 2017 Warren

Aff. ¶ 3.) At the same time, in light of the Warden's Forum Committee meeting notes evidencing improper searches, and Abcumby's affidavit, and drawing all reasonable factual inferences in favor of Plaintiffs at this stage, the Court finds that a jury could reasonably find in favor of Plaintiffs.

The parties do not dispute that MDOC received at least 67 grievances regarding some aspect of the chair portion of the strip search between 2009 and 2011. Thus, even though the four sets of grievance documents and the four sets of WFC meeting minutes that Plaintiffs have offered do not directly evidence any specific grievance or complaint regarding non-private strip searches, a reasonable jury could still find on this record that Warren's "apparent indifference to" a pattern of constitutional violations "could be reasonably expected to give rise to just the sort of injuries that occurred." *Campbell*, 700 F.3d at 790.

Defendants also raise a separate argument that Warren is entitled to qualified immunity with respect to Plaintiffs' Fourth Amendment claim as asserted against her in her individual capacity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). The qualified immunity doctrine requires the court to determine: (1) "whether the facts

that a plaintiff has alleged . . . make out a violation of a constitutional right" and (2) "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct." *Id.* at 232 (citations omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The crux of Defendants' argument in this regard is that because Plaintiffs have failed to make any showing that Warren was personally involved in (and thus responsible for) any constitutional violations at all, she is necessarily entitled to assert qualified immunity.

As discussed above, however, Plaintiffs have raised a genuine issue of material fact over whether an ongoing pattern of constitutionally violative strip searches can be attributed to Warren's implicit authorization of or knowing acquiescence to such searches, even if they were conducted in violation of a formal policy promulgated by MDOC, WHV, or both. Defendants' argument must fail for this reason. Additionally, although Defendants have not made any specific argument based on the "clearly established" prong of the qualified immunity test, the Sixth Circuit expressly held in its March 2016 opinion in this matter that "'the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others' was clearly established by February 2007—two years before Warren implemented the chair searches at issue." *Salem*, 643 F. App'x at 531 (quoting *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 575 (6th Cir. 2013)).

The principle that supervisory liability for constitutional violations by

36

subordinates may attach under Section 1983 based on implicit authorization or knowing acquiescence was clearly established by the time Warren assumed supervisory responsibility for WHV's search procedures as well. *See Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543 (6th Cir. 2008) ("A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'") (emphasis added) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). *See also Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 440 (6th Cir. 2002) ("[S]upervisor liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he [she] fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences.") (quoting *Braddy v. Florida Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)).

Finally, the Court notes that even though "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others was clearly established by February 2007," *Salem*, 643 F. App'x at 531 (internal quotation marks omitted), the Sixth Circuit has spoken again on this topic in the time since it issued its opinion in this case in March 2016. In *Sumpter v. Wayne Cty.*, 868 F.3d 473 (6th Cir. 2017), the Sixth Circuit recognized that even strip searches performed in the presence of other inmates, while undeniably intrusive, may nonetheless be constitutionally permissible where they are justified by a legitimate penological interest such as the maintenance of the health and safety of other inmates, which might otherwise be compromised by long delays caused by private strip searches. *See id.* at 485 ("[W]e accord considerable deference to defendants' assertion that they conducted group strip searches when the high volume of inmates and concomitant effect of delays on inmate health and safety demanded it. . . . [O]n one hand, the group strip searches plaintiff endured in the Registry were especially intrusive; on the other hand, defendants have asserted a legitimate penological justification for periodically conducting the searches."). In this case, however, Defendants have not asserted that non-private strip searches were conducted at WHV in order to protect the inmates' health, safety, or some other legitimate penological interest; Defendants' position is simply that to any extent such strip searches did occur, they cannot be attributed to any act or omission by Warren.

38

Because Plaintiffs have demonstrated the existence of a genuine issue of material fact regarding Warren's implicit authorization of, or knowing acquiescence to, a pattern or custom of non-private strip searches that violated the Fourth Amendment rights of the inmates that were subjected to them, the Court will deny Defendants' Motion for Summary Judgment or Qualified Immunity as to Plaintiffs' individual-capacity claim against Warren.

### 2. Prospective Injunctive Relief as to MDOC

Plaintiffs also seek prospective injunctive relief in this matter: specifically, a "Permanent Injunction prohibiting Defendants from subjecting Plaintiffs to policies and procedures that violate their constitutional, statutory rights, and common law rights." (Compl. at 14, Pg ID 14.) In its May 2015 Opinion and Order Granting in Part and Denying in Part Defendants' Motion to Dismiss and for Summary Judgment Based on Qualified Immunity, this Court rejected Defendants' argument that Plaintiffs' request for injunctive relief was moot because the chair-based strip searches had been formally abolished as a routine practice in 2011, and concluded based on "Plaintiffs' allegations of on-going strip searches which involve the use of a chair . . . that these searches are on-going and that the possibility of prospective relief remains viable." (May 2015 Opinion and Order at 37-38, Pg ID 275-76.) On appeal, the Sixth Circuit held that it lacked jurisdiction over Plaintiffs' request for injunctive relief. *See Salem*, 643 F. App'x at 531 Defendants now argue that the

request is moot both on Eleventh Amendment grounds and under the Prison Litigation Reform Act, 18 U.S.C. § 3626.

The Eleventh Amendment "protects states, as well as state officials sued in their official capacity for money damages, from suit in federal court. It also applies to state agencies or departments . . . ." *Boler v. Earley*, 865 F.3d 391, 409–10 (6th Cir. 2017) (internal citations omitted). One well-recognized exception to this form of immunity is relevant to this case, however: "a federal court may, without violating the Eleventh Amendment, issue a prospective injunction against a state officer to end a continuing violation of federal law." *Price v. Medicaid Dir.*, 838 F.3d 739, 746–47 (6th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123, 159 (1908)). The *Ex parte Young* doctrine "does not ... extend to any retroactive relief." *Puckett v. Lexington-Fayette Urban Cty. Gov't*, 833 F.3d 590, 598 (6th Cir. 2016) (internal quotation marks omitted) (quoting *S & M Brands, Inc. v. Cooper*, 527 F.3d 500, 507 (6th Cir. 2008)). "'[A] court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective' to determine whether the *Ex parte Young* doctrine avoids an Eleventh Amendment bar to suit." *Diaz v. Michigan Dep't of Corr.*, 703 F.3d 956, 965 (6th Cir. 2013) (quoting *Verizon Maryland Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002)).

Additionally, the Prison Litigation Reform Act ("**PLRA**") provides:

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a)(1).

Defendants' arguments based on the *Ex parte Young* doctrine and the PLRA are both premised on the assertion that Warren "ended the routine use of the chair portion of the strip search policy on December 16, 2011, . . . well before Plaintiffs brought the instant suit." (ECF No. 65, Defs.' Mot. Summ. J. (citing May 2015 Opinion and Order at 11-12, Pg ID 249-50).) Consequently, Defendants argue, there is no ongoing violation of federal law that would warrant injunctive relief.

Defendants are correct that Warren issued an order in late 2011 formally ending "the routine use of the chair portion of the strip search policy" at WHV in late 2011, pursuant to a memorandum that she issued on December 14, 2011. (ECF No. 11 Ex. A, Jan. 2014 Warren Aff. Ex. A, December 2011 Memorandum.) But in light of the Sixth Circuit's March 2016 opinion in this case, this action is no longer strictly concerned with the use, routine or otherwise, of the chair portion of the strip search policy. What is at issue now in this case is the use of *non-private* strip search procedures—a practice that has in fact been prohibited under the relevant policies

41

for the entirety of the time period in question. Moreover, as discussed above, there is a genuine issue of material fact as to the existence of a custom or pattern of employing that practice irrespective of its status under MDOC and WHV policies. Warren's formal termination of the routine use of the chair portion of the strip search policy in December 2011 is therefore immaterial to Plaintiffs' claim for prospective injunctive relief; what matters at present is whether there is an ongoing custom or pattern of non-private strip searches.

Defendants also rely on the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), but that case does not support Defendants' argument. *Lyons* had to do with the doctrine of standing rather than Eleventh Amendment immunity, and it involved a request for injunctive relief by a plaintiff who had been injured when he was placed in a chokehold by a police officer. The issue before the Court in *Lyons* was whether the plaintiff had standing to enjoin the police department from using chokeholds like that which had been used on him in the future, and the Court explained that this issue depended in turn on "whether he was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105. The Court's conclusion that the plaintiff lacked standing was grounded in the principle that for purposes of standing, "[a]bstract injury is not enough. The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of

injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101-02. In this case, the risk of the asserted harm occurring in the future is more concrete than it was in *Lyons*. *See id.* at 108 ("We cannot agree that the 'odds' that Lyons would not only again be stopped for a traffic violation but would also be subjected to a chokehold without any provocation whatsoever are sufficient to make out a federal case for equitable relief. We note that five months elapsed between [the incident] and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.").

Plaintiffs' claim for injunctive relief comes before the Court on Defendants' summary judgment motion; the question presented is whether, drawing all reasonable factual inferences in Plaintiffs' favor, there remains any genuine factual issue over the existence of a real and immediate threat of injury based on constitutionally violative non-private strip search procedures. And given the evidence before the Court, the Court will reserve judgment on this issue pending trial.

Accordingly, the Court will at this time deny Defendants' Motion for Summary Judgment or Qualified Immunity as to Plaintiffs' claim for injunctive relief.

## B.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs have filed a Motion for Partial Summary Judgment, seeking

"judgment in favor of all Plaintiffs that were strip searched in front of others." (Pls.'
Mot. Summ. J. at 2, Pg ID 579.) In that Motion, Plaintiffs note that they have
assembled a large number of inmates and former inmates "who have alleged that
they were strip [searched] while incarcerated at WHVCF in view of others." (*Id.* at
11, Pg ID 595.) Then, after summarizing the holdings in the Sixth Circuit's March
2016 opinion, as well as several cases that the Sixth Circuit relied upon in reaching
those holdings, Plaintiffs argue that

> [b]ased upon the Court of Appeal's prior decision on this exact matter
> and the foregoing case law unequivocally finding that body cavity strip
> searches performed in view of others without justification are
> unconstitutional, this Court must find that this type [of] egregious strip
> search forcing these women to use their hands to touch their vaginas
> while sitting fully exposed on a chair, in view of others, is a violation
> of their Fourth Amendment Rights. As such, summary judgment must
> be granted as to the women who were strip searched in front of other
> inmates and third parties, not necessary to the strip search, while
> incarcerated at WHVCF. As such, summary judgment must be granted
> as to the women who were strip searched in front of other inmates and
> third parties, not necessary to the strip search, while incarcerated at
> WHVCF.

(*Id.* at 14, Pg ID 598.)

As Defendants correctly point out, Plaintiffs' Motion for Partial Summary
Judgment does little more than summarize the law of the case. While the Sixth
Circuit did conclude that the type of search described by Plaintiffs violates the
Fourth Amendment—and that this principle was clearly established prior to

Warren's assumption of supervisory responsibility over inmate search procedures at WHV—this does not resolve any issues in Plaintiffs' favor that were not already resolved by the Sixth Circuit. Questions of fact remain as to whether Defendant Warren implicitly authorized or knowingly acquiesced in Fourth Amendment violations at WHV—an issue which the Sixth Circuit expressly did not reach on procedural grounds, *see Salem*, 643 F. App'x at 530—and also as to whether such violations are ongoing. Accordingly, the Court will deny Plaintiffs' Motion for Partial Summary Judgment.

## IV.    CONCLUSION

For all of the reasons stated above, the Court hereby DENIES Defendants' Motion for Summary Judgment and Qualified Immunity, and DENIES Plaintiffs' Motion for Partial Summary Judgment.

IT IS SO ORDERED.

Paul D. Borman
United States District Judge

Dated: AUGUST 24, 2018