UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMIRA SALEM and,
KESHUNA ABCUMBY,                         Case No. 13-cv-14567
on behalf of themselves and
a class of others similarly situated,    Paul D. Borman
                                         United States District Judge
                    Plaintiffs,
v.                                       R. Steven Whalen
                                         United States Magistrate Judge
MICHIGAN DEPARTMENT OF
CORRECTIONS and MILLICENT
WARREN,

                    Defendants.
_____/

OPINION AND ORDER (1) DENYING PLAINTIFFS' MOTION TO CERTIFY
CLASS (ECF NO. 66),  (2) DENYING PLAINTIFFS' MOTION FOR LEAVE OF
COURT TO FILE ADDITIONAL AFFIDAVITS (ECF NO. 95), AND
(3) SETTING A BENCH TRIAL ON EXHAUSTION OF THE TWO NAMED
PLAINTIFFS' CLAIMS FOR **NOVEMBER 6, 2019**

This is a putative class action involving the Plaintiffs' claims that certain strip

search procedures employed at the Women's Huron Valley Correctional Facility

("WHV") violated their Fourth Amendment rights.  The background of this litigation

is set forth in detail in several previous opinions of this Court.  *See Salem v. Mich.*

*Dept. of Corr.*, No. 13-14567, 2018 U.S. Dist. LEXIS 14457 (E.D. Mich. Aug. 24,

2018); *Salem v. Dept. of Corr.*, No. 13-14567, 2016 WL 7409953 (E.D. Mich. Dec.

22, 2016); *Salem v. Mich. Dept. of Corr.*, No. 13-14567, 2015 WL 1966727 (E.D.

Mich. May 1, 2015).  The Sixth Circuit has also issued an opinion following the parties' interlocutory cross-appeal of this Court's May 1, 2015 Opinion and Order. *Salem v. Mich. Dept. of Corr.*, 643 F. App'x 526 (6th Cir. 2016).  In summary, and as narrowed by these decisions, the Plaintiffs are a putative class of inmates and former inmates of the Michigan Department of Corrections ("MDOC") female-only WHV, alleging that the WHV and then Warden Millicent Warren, in both her official and individual capacities, violated their Fourth and Fourteenth Amendment rights by subjecting them to mandatory routine strip searches, allegedly in full view of other inmates and individuals not necessary to the search, following off-site visits (including hospital visits or leaving the prison on a writ) and following all contact visits (*i.e.* visits at the WHV in which a prisoner was allowed physical contact with her visitors).

Presently before the Court is Plaintiffs' Motion for Class Certification. (ECF No. 66.)  Defendants filed a Response to the Motion (ECF No. 71), Plaintiffs filed a Reply (ECF No. 73) and Defendants filed a Sur-Reply (ECF No. 84).  The Court has determined, pursuant to E.D. Mich. L.R. 7.1(f), that a hearing is not necessary and decides the matter on the parties' written submissions.

## I.      PROCEDURAL BACKGROUND

### A.      The Saga of Plaintiffs' Multiple Last-Minute "Document Dumps"

This motion for class certification was filed on December 15, 2017, but has yet to be heard due to the prolonged inability of Plaintiffs' counsel to properly submit competent evidence in support of their motion for class certification, as detailed below.  Before addressing the merits of the Plaintiffs' long-pending motion for class certification, the Court provides a brief but necessary explanation of the reason for the delay: the ongoing saga of the Plaintiffs' multiple affidavit "document dumps" and one of Plaintiffs' counsels' sheer inability to comply with the Court's numerous Orders regarding the insufficiency of their proposed "affidavit evidence." To begin with, attached to their Reply brief in support of their Motion for Class Certification, Plaintiffs attached approximately 840 pages of never-before-seen-or-referenced putative affidavits of current and former WHV inmates who claimed to have been subject to non-private strip searches while incarcerated at the WHV.  (ECF No. 73-1.)  Then, on the evening before the April 4, 2018 scheduled hearing on Plaintiffs' Motion for Class Certification, Plaintiffs filed a "Supplement" to their Reply that attached an additional seventy (70) pages of affidavits from additional putative class members claiming to have been strip searched in front of others.  (ECF No. 75, Supplement to Plaintiffs' Reply.)  Both sets of affidavits were sloppily presented with no tabbing or

indexing and suffered from numerous significant procedural failings, including failure of signatures and proper notarization.  In addition, many of the affidavits were not filled out at all and/or were duplicates.  On April 4, 2018, the morning of the hearing on the motion for class certification, the Court issued an Order striking the Plaintiffs' supplemental filing, more appropriately characterized as a last-minute completely disorganized document dump, as inappropriate supplementation under E.D. Mich. L.R. 7.1(d).  (ECF No. 76, 04/04/18 Order Striking Supplements to Plaintiffs' Replies.)  Following discussion of the improperly filed affidavits at the April 4, 2018 hearing, the Court canceled the hearing on the motion for class certification and issued another Order striking the 840 pages of affidavits attached to Plaintiffs' Reply brief and imposing sanctions against the Plaintiffs under 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying these proceedings.  (ECF No. 77, April 5, 2018 Order Striking Exhibits and Imposing Sanctions.)[1]

---

[1] The Court did proceed on April 4, 2018, to hear argument on the parties' motions for summary judgment, which were scheduled to be heard simultaneously with the Plaintiffs' motion for class certification.  The Court issued its Opinion and Order on the parties' summary judgment motions on August 24, 2018.  The Court ultimately determined that it was not necessary to consider the Plaintiffs' "affidavit evidence" for purposes of resolving the parties' motions for summary judgment.  (ECF No. 90, Opinion and Order Denying Defendants' Motion for Summary Judgment and Qualified Immunity and Denying Plaintiffs' Motion for Partial Summary Judgment.) No interlocutory appeal was taken from the Court's August 24, 2018 Opinion and Order.

In an effort to provide the Plaintiffs with every opportunity to present their claim, the Court issued a second Order on April 5, 2018, allowing Plaintiffs two-weeks time to submit to the Court any putative affidavits they sought to have the Court consider including "numbered pages, an index listing the name and page number for each individual affiant, tabbed pages separating each entry with the name of the individual affiant printed on the tab, and no duplicate entries." (ECF No. 78, April 5, 2018 Order Requiring Additional Filings.)  The Court also Ordered a counsel for the Plaintiffs (Kenneth Hardin) to file an Affidavit or Sworn Declaration explaining how the affidavits were created, describing how, where, and by whom the affidavits were signed and notarized, and otherwise detailing the process by which the affidavits were obtained and compiled.  (*Id*.)  The Court permitted the Defendants to file a Sur-Reply up to seven (7) pages addressing the impact if any of the re-filed affidavits on their Response to the Plaintiffs' motion.  (*Id*.)

On April 17 and 18, 2018, Plaintiffs filed the Hardin Affidavit along with the revised affidavits of the putative class members.  (ECF Nos. 79, 80.)  Once again, incredibly, the Plaintiffs failed to submit the required information in an appropriate or organized format.  On August 1, 2018, the Court held a hearing to address the continued deficiencies in the Plaintiffs' filings.  Following that hearing, the Court determined that Mr. Hardin's Affidavit was improperly notarized in Pennsylvania and

that many of the re-submitted affidavits of the putative Michigan class members were incomplete and non-conforming, and that further sanctions were warranted. That same day, the Court issued another Order Striking Filings and Imposing Sanctions, striking the Hardin Affidavit (ECF No. 79) and the "improper document dump of proposed affidavit exhibits" (ECF No. 80). (ECF No. 86, 08/01/18 Order Striking Filings and Imposing Sanctions.) In the 08/01/18 Order, the Court permitted Plaintiffs yet another final opportunity to re-file the putative class member affidavits, requiring submission on or before August 16, 2018. (*Id*.) On August 8, 2018, the Plaintiffs filed an Emergency Motion seeking additional time to submit the affidavits, explaining the difficulties Plaintiffs faced in attempting to obtain affidavits from putative class members who were still incarcerated, and seeking an additional thirty (30) days to re-file the affidavits. (ECF No. 88, Plaintiffs' Uncontested Motion for Order Amending the Court's August 1, 2018 Order Striking Filings.) The Defendants did not oppose this motion, and the Court issued an Order on August 15, 2019, granting the motion and permitting Plaintiffs to "properly file affidavit exhibits **no later than September 15, 2018**." (ECF No. 89, 08/15/18 Order.)

On September 14 and 15, 2018, as the Court had Ordered in its 08/15/18 Order, the Plaintiffs refiled the Hardin Affidavit and the affidavits of 188 putative class members. (ECF Nos. 91-94.) On December 18, 2018, continuing to submit untimely

new and additional evidence (discovery closed in this case on September 28, 2017 after several extensions and the dispositive motion deadline was December 15, 2017, also after several extensions had been granted), the Plaintiffs filed a Motion for Leave of Court to File Additional Affidavits from 23 additional putative class members. (ECF No. 95.)  The Defendants filed a Response to the Plaintiffs' motion on July 17, 2019 (ECF No. 98), and the Plaintiffs filed a Reply on July 24, 2019 (ECF No. 99). These 23 additional Affidavits are strikingly untimely and the motion to file them is DENIED.

**B.    The Court's Previous Order Denying Plaintiffs' Original Motion to Certify Class Without Prejudice**

On December 22, 2016, the Court issued an Order denying Plaintiffs' original motion for class certification without prejudice, finding inconsistencies between Plaintiffs' evolving class definition and the Sixth Circuit's ruling specifically defining the touchstone of unconstitutionality in this action as the allegedly non-private nature of the searches. (ECF No. 56, December 22, 2016 Opinion and Order Denying Plaintiffs' Motion for Class Certification Without Prejudice 9-10, PgID 514-15.)  At oral argument on the motion for class certification, Plaintiffs' counsel acknowledged that  the Sixth Circuit's March 9, 2016 Opinion limited this action to claims of non-private searches, specifically stating that if in "going through the grievances, if it was not specifically alleged to have been conducted in front of others, we would have no

7

choice but to voluntarily dismiss those potential claimants." (ECF No. 100, Transcript of November 16, 2016 Hearing 9:17-20) (hereinafter "11/16/16 Hr'g Tr.")  Based on the Sixth Circuit's directive and counsel's representations that inmate grievances would be forthcoming, the Court ultimately concluded that Plaintiffs' third proposed class of "women who suffered compensable injuries related to the chair portion of the search in full view of others during a discrete time frame" could potentially be ascertained "based on objective criteria such as exhausted grievances." (ECF No. 56, 12/22/16 Order Denying Class Certification 10-11, PgID 515-16.)  Despite finding that the Plaintiffs had preliminarily demonstrated ascertainability based on their anticipated review of grievances, the Court concluded that Plaintiffs failed to "affirmatively demonstrate" the remaining Rule 23 factors as required under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."). This Court was particularly troubled by the fact that named Plaintiff Salem had not even alleged in her Affidavit that her chair search was done in view of others and thus her claims were not typical of the class, and also by the "non-frivolous concerns regarding exhaustion of grievances" that the Defendants had raised regarding whether

the named Plaintiffs, not to mention the hundreds of proposed putative class members, had fully exhausted their claims as required under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA").  (12/22/16 Order at 13-14, PgID 518-19.)

The Court recognizes that Plaintiffs have no duty to plead exhaustion, and that Defendants bear the burden of establishing that Plaintiffs have not exhausted their remedies through the grievance procedure.  However, given the fact that the Defendants both pleaded exhaustion as an affirmative defense and have strenuously argued failure to exhaust in their opposition to the motion for class certification, and given the Court's obligation under *Wal-Mart* to conduct "a rigorous analysis" of the Rule 23 factors, and to "probe behind pleadings," which often "entail[s] some overlap with the merits of plaintiff's underlying claim," the exhaustion issue is front and center in the class certification analysis in this case.  In fact, at the November 16, 2016 hearing on the motion for class certification, counsel for the Plaintiffs expressly stated on the record that "if [the named Plaintiffs] failed to exhaust, they would not be eligible to participate."  (11/16/16 Hr'g Tr. 11:11-12.)   As the Court observed in its Order declining to certify a class, Plaintiffs' request for class certification presented the Court "with the unappealing prospect of certifying the class only to have both named Plaintiffs later dismissed from the suit based on a failure to exhaust their claims." (12/22/16 Opinion and Order 14, PgID 519) (citing *Johannes v. Washington*,

9

No. 14-cv-11691, 2015 WL 5634446, at *9-10 (E.D. Mich. Sept. 25, 2015) (Michelson, J.)).

Three years on, it appears that the Court is still faced with this prospect because there is no evidence in this record that either of the named Plaintiffs, or even any one of the 188 affiants, exhausted a grievance specifically complaining that they had been subjected to the chair search procedure in the full view of others. While the Affidavits finally filed by the Plaintiffs attempt to backfill the Plaintiffs' claims with assertions that they were searched utilizing the chair in view of numerous other people, the record in this case clearly demonstrates that the non-private nature of these searches was never an issue that the Plaintiffs expressly grieved, complained of, or otherwise brought to the attention of anyone at the MDOC.

## II.   CERTIFICATION UNDER RULE 23

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). "To come within the exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "[T]hat is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350. "[C]ertification is proper only

if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Id*. at 350-51 (internal quotation marks and citation omitted). The Court may not "presume" compliance with Rule 23's requirements but must satisfy itself through "rigorous analysis," that necessarily "entails some overlap with the merits of plaintiff's underlying claim," that there has been "actual" compliance. *Id*. at 351.

To merit class certification, the Plaintiffs must show that, as required under Fed. R. Civ. P. 23(a), "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." *In re Whirlpool Corp. Front Loading-Washer Pdcts. Liability Litig.*, 722 F.3d 838, 850 (6th Cir. 2013) (citing Fed. R. Civ. P. 23(a)). "These four requirements—numerosity, commonality, typicality, and adequate representation—serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." *Id*. at 850 (citing *Dukes*, 131 S. Ct. at 2550). "In addition to fulfilling the four prerequisites of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b)." *Id.* Where,

as here, the Plaintiffs seek to certify a class under Rule 23(b)(3), the Plaintiffs must demonstrate 'that the questions of law or fact common to class members predominate over any questions affecting only individual members' and that the class action is 'superior to other available methods' to adjudicate the controversy fairly and efficiently." *Id*. at 850-51. "The plaintiffs carry the burden to prove that the class certification prerequisites are met, and the plaintiffs, as class representatives, [are] required to establish that they possess the same interest and suffered the same injury as the class members they seek to represent." *Id*. at 851 (internal citation omitted).

## A. Plaintiffs' Proposed Class Definition and Plaintiffs' Underlying Claim

In the December 22, 2016 Opinion and Order denying without prejudice Plaintiffs' initial class certification motion, the Court addressed the following proposed plaintiff class:

> Any women who are currently, or have formerly been, incarcerated at the Women's Huron Valley Correctional Facility who were subject to the "chair portion" of the strip search in view of others between November 1, 2010 and November 1, 2013, and who allege they have suffered a compensable injury as a result of the search.

(*Salem II* at 9-10, Pg ID 514-15.) In the instant Motion for Class Certification, Plaintiffs propose a class definition identical to this definition, except that the relevant time span is "from November 1, 2010 to the present." (Pls.' Mot. Class Cert. at 8, Pg

12

ID 722.) Plaintiffs also seek to add the following six subclasses to the putative class definition:

> Any women subject to search during 2009-2010 time period before Warden's investigation of feasibility of chair-based strip search; any women subject to search and complaining that they were not given disposable seat covers before the April, 2011 memorandum from the Warden; any women subject to search and complaining that they were not given hand sanitizer before the April, 2011 memorandum from the Warden; any women subject to search and complaining that they were not given disposable seat covers after the April, 2011 memo from the Warden; any women subject to search and complaining that they were not given hand sanitizer after the April, 2011 memo from the Warden; and any women subject to search after December 14, 2011 to present time period after chair-based strip search policy "ended" in writing.

(Pls.' Mot. Class Cert. at 8, Pg ID 722.) Notably, however, none of these proposed subclasses are limited to individuals who were subject to strip searches in view of other inmates or persons without a legitimate penological need to be present. For that reason, these proposed sub-classes are outside the scope of this action, which (as emphasized above) has been limited by the Sixth Circuit to non-private strip searches. (*See Salem*, 643 F. App'x at 531) ("[V]iewing the facts in the light most favorable to Plaintiffs, we uphold the judgment of the district court denying qualified immunity to Warren regarding the non-private searches.").) For that reason, this Court addresses certification of the following class only:

> Any women who are currently, or have formerly been, incarcerated at the

Women's Huron Valley Correctional Facility who were subject to the "chair portion" of the strip search in view of others from November 1, 2010 to the present, and who allege they have suffered a compensable injury as a result of the search.

The Rule 23 inquiry, necessarily entwined as it is with the merits, must begin with an understanding of the Plaintiffs' underlying claim.  It is not possible to conduct a "rigorous" examination of the requirements of adequacy, typicality, commonality, and predominance without reference to the elements of the underlying claims. While the Complaint is a logical starting point in many instances, here six years of litigation and one round of appeal to the Sixth Circuit precedes this Court's Rule 23 analysis, and so the Court addresses the claim as shaped by the course of these proceedings. In any event, the Complaint provides no insight into the Plaintiffs' only remaining claim, captioned "Count II - § 1983 - 4th and 14th Amendment Due Process and Privacy Violations," which is pled in an entirely conclusory fashion, does not even distinguish among the various named Defendants or specifically attribute any alleged conduct to any particular Defendant, and certainly does not separately allege a *Monell*[2] claim.

Understanding Plaintiffs' interpretation of the underlying claim in this action is no easy task as Plaintiffs have failed to explain their theories of liability and have

---

[2]  *Monell v. Dept. of Soc. Serv. of City of New York*, 436 U.S. 658 (1978).

*never* articulated the theory behind their *Monell* claims against the MDOC and the Warden in her official capacity in anything other than broad conclusory terms. Against the weight of the undisputed evidence that the WHV chair search Policy does not authorize non-private searches, Plaintiffs rely directly on the chair search Policy and argue this as a blanket policy case, analogizing to several "strip search" cases in which courts have certified classes of prisoners (or former prisoners) who challenged blanket established institutional strip search policies applied in an across-the-board manner to defined categories of inmates. *See, e.g., In re Nassau Cty. Strip Search Cases*, 461 F.3d 219 (2d Cir. 2006) (certifying a class of all newly-admitted misdemeanor detainees strip searched without reasonable suspicion pursuant to a blanket policy); *Maneely v. City of Newburgh*, 208 F.R.D. 69 (S.D.N.Y. 2002) (certifying a class where the defendants "implemented a uniform, indiscriminate policy of strip searching all detainees, in the absence of reasonable suspicion"); *Johnson v. District of Columbia*, 248 F.R.D. 46 (D.D.C. 2008) (certifying a class of arrestees who were subject to a blanket "drop, squat, and cough" search without individualized reasonable suspicion); *Calvin v. Sheriff of Will Cty.*, No. 03-C-3086, 2004 WL 1125922 (N.D. Ill. May 17, 2004) (finding commonality and certifying a strip search class as to a blanket "no reasonable suspicion" strip search policy, that was applied routinely to a defined class of arrestees, where "the ultimate legal

question is not whether jail personnel made erroneous reasonable suspicion determinations regarding each individual," but rather whether the blanket policy, which did not require reasonable suspicion, unconstitutionally "avoided all such inquiry"); *Eddelman v. Jefferson Cty. Ky.*, 96 F.3d 1448 (6th Cir. 1996) (unpublished) (finding that the fact that some searches were more or less intrusive did not defeat commonality because the differences were not relevant where the plaintiffs claimed that all searches without reasonable suspicion of those arrested for minor offenses was unconstitutional, regardless of whether the arrestee was forced to disrobe or whether the search occurred in the presence of others).

But the chair search Policy does not authorize non-private searches, and yet Plaintiffs preface their motion for class certification with the statement that "[t]he strip search procedure was a policy implemented by the Michigan Department of Corrections. As implemented policy, the strip search was not a matter to be addressed through the filing of grievances." (Pls.' Mot. 8, PgID 722.) Plaintiffs assert that several inmates were told that the chair search procedure was "policy" and could not be grieved. (*Id*.) It is undisputed that the chair search procedure was Policy and the content of MDOC policies, as discussed *infra*, are not generally grievable except as specifically applied to the prisoner. However, there is no dispute that the chair search Policy did not authorize non-private searches, and in fact demanded the opposite. The

16

Policy Directives and WHV Operating Procedures governing "Search and Arrest in Correctional Facilities" that were in effect before, during and after the time period relevant to this case all required that strip searches be conducted only by employees of the "same sex" (with limited exceptions) and be "conducted in a place which prevents the search from being observed by those not assisting in that search" (again, with limited exceptions).  (See ECF No. 11-2, PD 04.04.110 (eff. 02/01/09), PgID 119; WHV OP 04.04.110 (eff. 05/01/2009), PgID 130; ECF No. 17-4, PD 04.04.110 (eff. 04/09/2012), PgID 199.)  Plaintiffs have cited no provision of PD 04.04.110, WHV-OP-04.04.110, or any other formal policy or directive that would have authorized officers to conduct strip-searches on inmates in the presence of other inmates or other individuals not necessary to the penological purposes of the search.

The touchstone of unconstitutionality that survived the Defendants' appeal to the Sixth Circuit is the claim that the chair strip searches were conducted in full view of other inmates or persons without a legitimate penological need to be present. The Plaintiffs have expressly acknowledged that this is the scope of the claim going forward in this case:

> Ms. Miller: Your Honor, I believe that because the unconstitutional – the standard that we were given from the Sixth Circuit is that it was done in view of others.  So in my view, no other claims would survive.  We're still in discovery. If we confined it to that definition while we're going through the grievances, *if it was not specifically alleged to have been*

*conducted in front of others, we would have no choice but to voluntarily dismiss those potential claimants.*

(11/16/16 Hr'g Tr. 9:13-20.) (emphasis added).

It is undisputed that the scope of this action is now limited to claims that Plaintiffs were subject to non-private chair strip searches, and there is no colorable argument that the chair search Policy authorized the chair strip searches to be conducted in view of others. In fact the Policy directed a one-on-one, same-sex search. Yet Plaintiffs repeatedly tether their Fourth Amendment claim to the Policy itself, insisting that they are relieved of any exhaustion requirement because the chair search was "Policy" and they were unable to grieve "Policy." Plaintiffs insist in their motion for class certification that "the filing of grievances cannot be a prerequisite to class membership because the strip search procedure was policy and under MDOC's own instruction, 'not able to be grieved.'" (Pls.' Mot. 10, PgID 724.) Plaintiffs argue, without citation to any authority, that therefore the Court should rely on the 188 after-the-fact affidavits that they created for inmates to sign and simply excuse the fact that it appears that none of them, including the named Plaintiffs, grieved, much less fully exhausted, the issue of non-private chair searches at the time those searches occurred. But non-private searches were never Policy and such intrusions were always grievable. Yet Plaintiffs have not produced one fully exhausted grievance from any

18

inmate, let alone from the named Plaintiffs, grieving this aspect of the search (or for that matter any fully exhausted grievances period).

Plaintiffs appear to recognize the weakness of their theory, arguing in their motion for class certification that "exclud[ing] women from the class action solely because they did not expressly state that they were strip searched in front of others in their grievance is an undue burden to place upon these women who had just endured a trauma and report limited reading and writing skills." (Pls.' Mot. 10, PgID 724.) Yet counsel for Plaintiffs previously stated in a hearing before this Court that if a proposed Plaintiff had not alleged in a grievance that she had been searched in front of others, Plaintiffs would have "no choice but to dismiss them from this action." (11/16/16 Hr'g Tr. 9:19-20.) But that was before counsel apparently discovered that none of the proposed class members was sufficiently aggrieved by the presence of others at the time of their searches to mention that affront in any grievance, or in any forum meeting with the Warden, or in any other manner contemporaneously with the searches. (*See* discussion *infra*.) Only now, having been presented with check-box affidavits that present this specific query, do the proposed class members recall and report that "others" were present.

This non-private aspect of the search is the essence of the constitutional claim that has survived in this case – as Plaintiffs' counsel conceded at the previous class

certification hearing, there is no Fourth Amendment claim without such an allegation. Regardless of how Plaintiffs attempt to characterize their claims, the Fourth Amendment violation they complain of was in fact always grievable.  Plaintiffs' attempt at revisionist history, trying to give extreme importance now to an issue that appears not to have merited mention by the inmates at the time of the actual events under scrutiny, cannot change the nature of the Fourth Amendment claim that Plaintiffs must demonstrate.

Plaintiffs' motion for class certification offers no clarity at all on the nature of their claim. The brief speaks in vague generalities proclaiming that "the nature and extent of defendants' unconstitutional practices are common to the named Plaintiffs and all proposed and potential class members," with no amplification whatsoever describing those vague but common "practices."  Plaintiffs acknowledge that "the circumstances surrounding each class member's chair portion of Defendants' strip search procedure were not identical," but simply conclude that nonetheless the Plaintiffs' claims all "stem from the same alleged unconstitutional conduct." (Pls.' Mot. 17, PgID 731.)

All that is missing here is everything. After six years of opportunity to discover evidence and develop theories of liability, there is no explanation or analysis of the alleged unconstitutional conduct that was "common to all" other than the blanket

assertion that the all class members suffered from the same unconstitutional conduct, i.e., a chair search pursuant to the MDOC Policy, which it is undisputed did not authorize the conduct of which the class complains. "'It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones.'" *Bishop v. Gosiger, Inc.*, 692 F. Supp. 2d 762, 774 (E.D. Mich. 2010) (quoting *Meridia Prods. Liab. Lit. v. Abbott Labs.*, 447 F.3d 861, 868 (6th Cir. 2006)). "'[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Id.* (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)).

Determining the Defendants' liability as to each and every search will require individualized proof regarding whether others were present and whether the presence of "others" was related to the penological purpose of the search. In addition, as discussed in detail *infra*, individualized inquiries regarding exhaustion also will require separate analysis as to each class member's claim.  In short, "mini-trials" will be required to determine whether, in any given instance, the circumstances of the search were such that Plaintiffs can assert a viable claim that Defendants violated their Fourth Amendment rights.  As discussed *supra*, unlike a claim related to a blanket policy that has been indisputably applied across-the-board to a defined group of individuals, Plaintiffs' claim relates to the manner in which individual searches were

carried out and whether they were carried out in violation of a governing Policy specifying private searches.  In short, Plaintiffs' underlying claim relates to numerous unrelated allegedly non-private searches that, if they occurred as alleged, may have violated WHV Policy and could and should have been grieved.   With this understanding of Plaintiff's underlying claim, the Court now turns to an analysis of the Rule 23 factors, beginning with those that most clearly mandate denial of class certification here.[3]

---

[3] As discussed *supra*, Plaintiffs have made no effort to develop any theory of *Monell* liability apart from their reliance on the chair search Policy itself.  And even then, Plaintiffs have never explained how the Policy itself supports their *Monell* claim.  In arguing that the Warden was not entitled to qualified immunity, Plaintiffs alluded to a claim based on a "policy of inaction," citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005). (ECF No. 67, Pls.' Resp. to Defs.' Mot. for Summ. Judg. and Qualified Immunity 17, PgID 788.)  There are several problems with this reference.  First, the discussion of a "policy of inaction" in *Garretson* to which the Plaintiffs cited was with respect to Garretson's claim against the municipality, not the individual officers, and thus *Garretson* was a completely inapt reference in the context of the Warden's liability in her individual capacity and her entitlement to qualified immunity. In referencing *Garretson* in this context, Plaintiffs conflate the concept of supervisory liability of a policymaker in an individual capacity with a policy of inaction claim against a municipality.  *See Essex v. Cty. of Livingston*, 518 F. App'x 351, 355-56 (6th Cir. 2013). If Plaintiffs were suggesting some type of *Monell* claim against the MDOC and the Warden in her official capacity with this reference (even though the issue before the Court was solely the Warden's entitlement to qualified immunity), they have made no effort to develop such a claim.  In fact, having elected to base their claims on the argument that the chair search Policy *authorized* the claimed Fourth Amendment violations and that therefore the Policy could not be grieved, they  cannot credibly turn around and argue that they are actually making a claim that there was a custom or practice of violating the chair search Policy.  In any event, there is no evidence in this fully-developed record that would support such a

claim.  In order to establish a "policy of inaction," Plaintiffs must show:

> (1) a clear and persistent pattern of [non-private chair strip searches]; (2) notice, or constructive notice of such pattern, to [the MDOC]; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the "moving force," or direct causal link, behind the constitutional injury.

*Garretson*, 407 F.3d at 796 (citing *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  Here, after six years of litigation, as discussed at length in this Opinion and Order, Plaintiffs have failed to submit competent evidence that the Warden or the WHV was made aware that there was a persistent pattern of inmates being chair strip searched *in view of other inmates or persons without a legitimate penological need to be present*, let alone that there was official approval of and a failure to act in response to such a pattern.  While many aspects of the chair strip search *were* brought to the attention of the Warden (and were addressed) there is simply no evidence that the inmates complained that the searches were being conducted in a non-private setting.  In fact, the only contemporaneous partial grievances that have been submitted indicate that the search was conducted by a *single* corrections officer.  *See* ECF No. 67-2, PgID 913-17, Partial Grievance of inmate DeBruin, complaining that she was "asked to strip and sit in a chair by officer Sharpe," never mentioning the presence of another individual and suggesting the presence of a single corrections officer; ECF No. 67-2, Partial Grievance of inmate Radtke, complaining that she was "forced to perform a body cavity search in front of WHV officer," which made her feel violated and humiliated, making no mention of the presence of the others and suggesting the presence of a single corrections officer.  After six years of litigating this case, Plaintiffs have failed to articulate or proffer evidence in support of any variant of a custom or practice claim and it is not the Court's job to hypothesize such a claim or search the record for evidence in support of such a claim.  "[D]istrict courts cannot be expected to dig through the record to find the seeds of a party's cause of action.  Plaintiff must mark each site, identifying the genuine disputes of fact that preclude summary judgment on a particular claim.  The district court had no obligation to do plaintiff's work for her, nor do we."  *Sumpter v. Wayne Cty.*, 868 F.3d 473, 490 (6th Cir. 2017).  Similarly, Plaintiffs' completely conclusory one-sentence reference in their motion for class certification to a "failure to protect this vulnerable population

### B.      Commonality, Typicality, Predominance

To obtain class certification, Plaintiffs must demonstrate that "the claims or defenses of the representative parties are typical of the claims or defenses of the class," Fed. R. Civ. P. 23(a)(3), and that "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4). If Plaintiffs satisfy these factors, and thereby satisfy all four prerequisites set forth in Fed. R. Civ. P. 23(a), they must then satisfy one of the three prongs of Rule 23(b). Here, Plaintiffs proceed under Rule 23(b)(3), which allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).   "[T]he commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 349 n. 5.  If the Court finds a clear failure of proof on the issue of commonality, "it is unnecessary to resolve whether [Plaintiffs] have satisfied the typicality and adequate-representation requirements of Rule 23(a)." *Id.*

---

by declining to supervise, train, monitor, discipline, regulate prison staff," with *zero* analysis of any element of any one of these types of *Monell* claims (Pls.' Mot. 6, PgID 720), is so lacking in substance after six years of litigation that it merits no analysis. "'It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to put flesh on its bones.'" *Bishop*, 692 F. Supp. 2d at 774.

### 1. Individualized inquiries as to liability preclude class certification.

Plaintiffs' claim that class members were searched pursuant to the chair search Policy in view of others who were unnecessary to the penological purposes of the search, which in fact would be contrary to the chair strip search Policy, necessarily requires resolution of particularized inquiries regarding each individual search. Unlike blanket strip search policy claims that do not rely on the particulars of any individual search, Plaintiffs' claims are not amenable to class treatment because they do not present a "common contention . . . that is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. If Plaintiffs were claiming that a WHV policy authorized non-private searches, that all class members were searched pursuant to that policy, and that the policy was invalid on its face, resolution of the issue of the constitutionality of that policy possibly could determine "in one stroke" a central issue to those class claims. But here, the Policy prohibits the alleged unconstitutional conduct and thus the manner and degree of intrusiveness of each individual search will be central issues that cannot be resolved "in one stroke." *See, e.g., Gustafson v. Polk Cty., Wis.*, 226 F.R.D. 601, 605-06 (W.D. Wis. 2005) (Crabb, C.J.) (finding that commonality requirement was not met when the plaintiffs' claims necessarily required "an examination of the extent

of the intrusiveness of each class member's strip search or the manner in which the searches were conducted"); *Klein v. DuPage Cty.*, 119 F.R.D. 29 (N.D. Ill. 1988) (declining to certify a class of inmates who complained that routine "strip-and-cavity searches" conducted before and after court appearances and visitations where the reasonableness of each search was dependent upon "special institutional security concerns" and where each search may have been conducted in a "variety of ways").

It is undisputed that the Plaintiffs are claiming that the putative class members' Fourth Amendment rights were violated on a number of different occasions, by a number of different individuals, under a number of different circumstances.  The Affidavits report the presence of various individuals (some by name, some not), and list a number of dates on which the Plaintiffs and putative class members were searched (some with specific dates, some with only years or ranges), and do not connect the presence of any particular individual with any particular search date. Moreover, the Affiants purport to define which correctional officers were "necessary" to their particular searches by identifying individuals they deemed to be "unnecessary" parties who viewed their search and then indicating YES/NO whether "the only unnecessary party/parties identified above was/were Correctional Officer Trainees." Again, these responses are directed generally to the inmate's identification of a group of "others" who were alleged to have been present without specification of which

individuals were present at and "unnecessary" for any particular search. This question seemed to confound many Affiants (as it does the Court) as several of the inmates either did not answer this question or scribbled out their original response and provided a different response, likely because an inmate would have no basis for determining the penological necessity of others who may have been present during her search – especially when asked to recall the circumstances of the event many years after the search occurred.

The Defendants' liability as to each and every search will require individualized proof regarding whether "others" were present and whether the presence of "others" was related to the penological purpose of the search.  Here, the Policy prohibits the alleged unconstitutional conduct and thus the manner and degree of intrusiveness of each individual search will be central issues that cannot be resolved "in one stroke," defeating commonality. *Dukes*, 564 U.S. at 350.

### 2. Individualized inquiries regarding exhaustion preclude class certification.

Under the PLRA, a prisoner may not bring an action "with respect to prison conditions under section 1983 of this title, or any other Federal law ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Congress enacted this provision to address the "outsized share" of prisoner litigation

filings and to ensure that "the flood of nonmeritorious claims does not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007). Put another way, the purpose of § 1997e(a) is to "reduce the quantity and improve the quality of prisoner suits." *Porter v. Nussle*, 534 U.S. 516, 524 (2002). In addition, exhaustion "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of [the agency's] procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (internal quotation marks and citations omitted).

"There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211. The prison's grievance process determines when a prisoner has properly exhausted his or her claim. *Id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). Even where a prisoner has made some attempts to go through the prison's grievance process, "[t]he plain language of the statute makes exhaustion a precondition to filing an action in federal court." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999). The prisoner "may not exhaust his [or her] administrative remedies during the pendency of the federal suit." *Id.* (citations omitted); *see also Woodford*, 548 U.S. at

95 ("A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction...."). However, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216. Instead, failure to exhaust administrative remedies is an affirmative defense under the PLRA. As such, Defendants bear the burden of proof on exhaustion. *Surles v. Andison*, 678 F.3d 452, 456 (6th Cir. 2012) ("A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative remedies.").

### a.   Grievance Procedures at the MDOC

Pursuant to its Policy Directive 03.02.130, dated July 9, 2007, the administrative remedies available at the MDOC are as follows. First, the prisoner must attempt to resolve any issue with the staff member involved within two business days of becoming aware of a grievable issue. (ECF No. 50-1, Policy Directive 03.02.130 (eff. 07/09/2007) ¶ P, PgID 471-77.)  If the issues are not resolved within five business days, the prisoner may file a Step I grievance using the appropriate form. (*Id.*)  "The issues should be stated briefly but concisely" and "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included." (*Id.* ¶ R.) The prisoner should receive a response within fifteen business days of filing the grievance. (*Id.* ¶ X.)

If the prisoner is dissatisfied with the disposition of the grievance, or does not receive a response by ten business days after the due date, he or she may file a Step II grievance using the appropriate form.  (*Id.* ¶ BB.)  As with Step I, a response to the Step II grievance should be issued within fifteen business days.  (*Id.* ¶ CC.)

Similarly, if the prisoner is dissatisfied with the Step II response or does not receive a response by ten business days after the response was due, he or she may file a Step III grievance.  (*Id.* ¶ FF.)  The matter is fully exhausted after the disposition of the Step III grievance.  *Surles*, 678 F.3d at 455 ("A grievant must undertake *all* steps of the MDOC process for his grievance to be considered fully exhausted.") (emphasis added).

### b.   Exhaustion as an issue precluding class certification

As this Court recognized in December 2016 when denying Plaintiffs' prior motion for class certification without prejudice:

> Defendants have raised substantive and non-frivolous concerns regarding exhaustion of grievances.  It is unclear from the complaint, affidavits, and briefing whether the named representative Plaintiffs have exhausted their claims as required by the Prison Litigation Reform Act.  *See Jones v. Bock*, 549 U.S. 199, 211 (2007) (holding that "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.").  The Court recognizes that Plaintiffs have no duty to plead exhaustion.  *See Surles v. Andison*, 678 F.3d 452, 455-56 (6th Cir. 2012) ("A PLRA defendant bears the burden of proving that a PLRA plaintiff has not exhausted his administrative

remedies."). Yet, in the present case there are real concerns over whether either named Plaintiff exhausted their grievances. (*See* Compl., ¶¶ 35-38, alleging that Plaintiffs "are regularly not allowed to file grievances challenging policies or procedures and Defendants do not provide an alternative administrative mechanism to exhaust the claims set forth in this Complaint.").

Thus, the Court is faced with the unappealing prospect of certifying a class only to have both named Plaintiffs later dismissed from the suit based on a failure to exhaust their claims. *See Johannes v. Washington*, No. 14-cv-11691, 2015 WL 5634446, at * 9-10 (E.D. Mich. Sept. 25, 2015) (Michelson, J.) (declining to certify a class before addressing threshold issue of exhaustion because defendants raised "non-trivial concerns about exhaustion" and "[o]therwise the Court risks certifying a class only to later find that the claims of all six of the class representatives must be dismissed, and, therefore, their claims are atypical and they are inadequate class representatives."). These legitimate concerns lead the Court to conclude that Plaintiffs have not satisfied the requirements of Rule 23(a)(3) and (4) and have not shown that the named Plaintiffs are adequate representatives of the potential class or that their claims are typical of the class. Accordingly, the Court concludes that it would be imprudent to certify a class at this time.

(12/22/16 Opinion and Order 13-14, PgID 518-19).

Those same "substantive and non-frivolous concerns regarding exhaustion of grievances" remain at issue here and similarly preclude certification. Specifically, despite the Court's ruling above, Plaintiffs only submitted three unexhausted grievances with their instant motion for class certification, none of which belong to the named Plaintiffs and all of which were rejected as untimely filed. (See ECF Nos.

66-4, Wascher-McIntosh Griev., PgID 746-51, 66-5, Turner Griev., PgID 752-57, and 66-6, Tanner Griev., PgID 758-63.) *See Scott v. Ambani*, 577 F.3d 642, 647 (6th Cir. 2009) (stating that a prisoner cannot satisfy the exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance). Plaintiffs otherwise failed to submit *any* exhausted grievance by the named Plaintiffs (or any putative class member) with their instant motion (although they did previously provide grievance records for Abcumby which do not appear exhausted, as explained further below), and instead propose new criteria for ascertaining class membership – the 188 affidavits by prisoners who swear that they were subjected to the chair strip search in view of others.

Defendants argue that Plaintiffs make only conclusory allegations regarding exhaustion, without citation to any evidence in the record, and that "Plaintiffs' failure to produce even one exhausted claim of a potential class member calls into question whether this action is suitable as a class action." (ECF No. 71, Defs' Resp., PgID 947-48, 950.) The Court agrees that the unanswered issue of whether either of the named Plaintiffs, or even any putative class member, have exhausted their administrative remedies regarding the sole remaining claim in this case – that they were subjected to the chair strip search in view of other inmates or persons without a legitimate penological need to be present – raises concerns regarding Plaintiffs'

32

ability to meet their burden to demonstrate that: (1) "the claims or defenses of the representative parties are typical of the claims or defenses of the class" (typicality) (Rule 23(a)(3)); (2) "the representative parties will fairly and adequately protect the interests of the class" (adequacy) (Rule 23(a)(4)); and (3) "that the questions of law or fact common to class members predominate over any questions affecting only individual members" (predominance) (Rule 23(b)(3)).

> i.   **Plaintiffs have failed to produce any exhausted grievances, despite their unsupported assertions that the named Plaintiffs have "exhaust[ed] their [administrative] remedies" and the majority of putative class members' attestations that they have "completed the grievance process"**

As explained above, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought into court." *Jones*, 549 U.S. at 211.  Plaintiffs concede in their motion for class certification that they "have since [their prior motion for class certification] received grievances and other documents from the MDOC," (Pls.' Mot. 7, PgID 721), and Defendants confirm that Plaintiffs "hav[e] all of the relevant grievances."  (ECF No. 71, Defs.' Resp. 6, PgID 944).

Plaintiffs then unambiguously state that "both named Plaintiffs did exhaust their remedies by filing Step I-III grievances."  (Pls.' Mot. 18, PgID 732.)  However, they fail to attach those purported grievances to their motion (even though they do attach (unexhausted) grievance documents of three putative class members). The only

evidence regarding Plaintiff Abcumby's alleged administrative exhaustion in the record is six pages of grievance records attached to Plaintiffs' Response to Defendants' Motion for Summary Judgment and Qualified Immunity (ECF No. 67-2, Pls.' Resp. Opp'n Summ. J. Ex. 15, Abcumby Grievance Records, PgID 918-23), and while those documents may evidence that Plaintiff Abcumby initiated a grievance regarding the chair strip search procedure, they do not show that she exhausted the process. The record contains no grievance records for Plaintiff Salem at all, despite her uncorroborated statement in her February 9, 2014 affidavit that she "filed a grievance on September 4, 2011" regarding "utilizing the chair in the strip search." (ECF No. 17-5, Pls.' Resp. Opp'n MTD, Ex. 4, PgID 211.)

In addition, the overwhelming majority of the affidavits supplied by Plaintiffs at the time they filed their reply brief similarly assert in a check-box fashion that the affiants "did complete the grievance process regarding the search(es)." (ECF Nos. 92, 93, 94.) However, again, Plaintiffs fail to supply even one of those "complete[d]" grievances in support of their motion for class certification.

While recognizing that it is Defendants' burden to prove failure to exhaust administrative remedies, the exhaustion issue nevertheless impacts Plaintiffs' ability to demonstrate that they are adequate class representatives and that their claims and defenses are typical of those of the class members, and raises concerns about the

potential for individualized factual and legal issues predominating over class-wide issues.

### ii.    The grievances that have been supplied fail to complain about the "non-private" nature of the searches

Of the few unexhausted grievances Plaintiffs have provided to the Court, no grievance contains allegations stating or inferring that other inmates or other persons "not assisting in that search" were in the room or otherwise complains about the "non-private" nature of the prisoner's search. Rather, these grievances complain only about being subjected to the "spread labia" chair search, which they found "humiliating" and "degrading." (*See* Wascher-McIntosh Griev., PgID 747; Turner Griev., PgID 757; Tanner Griev., PgID 763; *see also* Radtke, Williams, deBruin, and Abcumby Grievs., PgID 901-23.)

Plaintiffs contend that the grievances submitted cannot be expected to contain "every allegation of misconduct that occurred within the strip search procedure." (Pls.' Mot.9, PgID 723.) But the purpose of the exhaustion requirement is to provide "fair notice of … alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint." *Bell v. Konteh*, 450 F.3d 651, 654 (6th Cir. 2006) (quotation marks and citation omitted), *abrogated on other grounds by Jones*, 549 U.S. at 219. Therefore, "[a]n

inmate's grievance must give 'sufficient notice of the matter being grieved ...,' so that '[p]rison officials ... ha[ve] a chance to provide a remedy for the inmate and to decide whether the objectives of the review process have been served.'" *Rivers v. Turner*, No. 3:14 CV 2547, 2016 WL 4065884, at *3 (N.D. Ohio July 29, 2016) (quoting *Maxwell v. Corr. Med. Servs., Inc.*, 538 F. App'x 682, 688 (6th Cir. 2013)); *Mattox v. Edelman*, 851 F.3d 583, 591 (6th Cir. 2017) ("We have also explained that the purpose of the PLRA's exhaustion requirement 'is to allow prison officials a fair opportunity to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court.'") (quoting *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010)); *Woodford*, 548 U.S. at 90 ("The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to 'afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.'"). Therefore, it is important that "[t]he issues [a plaintiff] may raise ... in [her] lawsuit are limited to the *specific issues* raised ... in [her] grievance." *Vandiver v. Martin*, 48 F. App'x 517, 519 (6th Cir. 2002) (emphasis added) ("The exhaustion requirement would be defeated if an inmate were permitted to raise additional issues ... in a § 1983 action that were never mentioned in the grievance."); *see also Ford v. Martin*, 49 F. App'x 584, 585 (6th Cir.

2002) (finding failure to exhaust when the issues in the "grievances did not raise the same issues as those asserted in the … complaint"); *Baldridge-El v. Gundy*, 238 F.3d 419, 2000 WL 1721014, at *1 (6th Cir. 2000) (table case) (finding claims were properly dismissed when they were not included in the grievances the plaintiff had filed); *Rumsey v. Mich. Dep't of Corr.*, No. 1:10 CV 880, 2013 WL 5442400, at *7 (W.D. Mich. June 24, 2013) (explaining that the plaintiff was required to bring the specific allegations to the attention of prison officials through the grievance procedure); *Bartelson v. Parker*, No. 19-cv-281, 2019 WL 3849159, at *1 (E.D. Ky. Aug. 15, 2019) (concluding that plaintiff's § 1983 claim regarding a strip search conducted in view of other inmates was not exhausted when the underlying grievance "complained only that the search was done in front of a security camera [but] did not allege or complain that it was conducted in front of other inmates").

Here, while Plaintiffs have submitted a few unexhausted grievances complaining about the "spread labia" chair strip search Policy as applied to the individual grievant, there is no grievance in the record complaining that other inmates were in the room or otherwise complaining about the "non-private" nature of the search, and thus no grievance that would serve to provide notice of this alleged constitutional violation to prison officials.  In addition, even the Warden Forum Committee notes produced earlier in this litigation fail to include *any* mention of a

complaint about the "non-private" nature of any search, although there were other discussions regarding the manner of search, whether it violated religious principles, etc. (ECF No. 67-2, Warden Forum Comm. Notes, PgID 882, 889, 896-97, 899-90.) Accordingly, there is no record evidence before the Court that Defendants were "on notice" of any complaint that strip searches were being conducted in a "non-private" manner in violation of the chair strip search Policy.  Plaintiffs' counsel conceded at the hearing on the original motion for class certification that Plaintiffs' inability to demonstrate a class member's exhaustion of any grievance regarding the "non-private" nature of any search would result in dismissal of that Plaintiff or putative class member from the action.

### iii.   Plaintiffs and putative class members were required to grieve alleged violations of the strip search policy

The MDOC policy directive on Prisoner/Parolee Grievances, PD 03.02.130, provides that while "[a] grievant may not grieve the <u>content</u> of policy or procedure *except as it was specifically applied to the grievant[,]*" (PD 03.02.130(F)(1) (emphasis added), PgID 471-72), "[g]rievances may be submitted regarding *alleged violations of policy or procedure* or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures." (*Id..* (E) (emphasis added).)  Thus, prisoners may grieve alleged *violations* of policy

or procedure as well as the content of policies or procedures as "specifically applied" to them, and they must exhaust those grievances before they are permitted to seek relief in federal court. *See Jones*, 549 U.S. at 211; *Owens v. Keeling*, 461 F.3d 763, 769 (6th Cir. 2006) ("So long as the prison system has an administrative process that will review a prisoner's complaint ... the prisoner must exhaust his prison remedies.") (quoting *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999)).  This requirement applies to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 F.3d 485, 489 (7th Cir. 2002).

Plaintiffs try to get around the requirement that they must exhaust their administrative remedies in part by arguing that "[a]s implemented policy, the strip search was not a matter to be addressed through the filing of grievances." (Pls. Mot. 8, PgID 722, citing Ex. 2, Warden Warren Dep. 8.)  Plaintiffs refer to testimony that Defendant Warren provided in her deposition:

> Q.    . . . What types of issues can be grieved?
> A.    Grieved by?
> Q.    Inmates.
> A.    Prisoners can grieve any issue they feel is unjust. However, they cannot grieve policy.

Q.     Okay. So when, as here in this case, there are complaints about an
existing policy, what can the inmate do besides a grievance to
have their issues heard?

A.     Once they grieve through the third step and have exhausted all of
their remedies, they can then go to a court for a decision.

Q.     If they can't grieve the policy, so they can't even get to the three-
step process, what can they do as an alternative?

A.      They can always grieve even if it is denied. They just have to
exhaust their remedies.

(Warren Dep. 8:1-22, PgID 745.)  Plaintiffs similarly contend in their Reply brief that

they "learned throughout discovery that the strip search procedure was policy and

therefore not grievable" because "[a]s the MDOC does not permit inmates to grieve

policy, such as the strip search procedure, the Plaintiffs cannot be required to have

filed futile grievances merely to exhaust administrative remedies." (ECF No. 73, Pls.'

Reply 2, PgID 1806.)

First, Plaintiffs have cited no authority for their argument that the perceived (or

even actual) futility of filing grievances is a basis for excusing noncompliance with

the PLRA's administrative exhaustion requirement, and the governing case law

weighs in the opposite direction.  *See Hix v. Tennessee Dep't of Corr.*, 196 F. App'x

350, 354 (6th Cir. 2006) ("There is no futility exception to the exhaustion

requirement.") (citing *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001)); *Jones v.

Douglas*, 108 F. App'x 254, 256 (6th Cir. 2004) ("[U]nder *Booth*, even futile claims

must be exhausted under § 1997e(a) before filing a § 1983 complaint.") (citing *Booth*, 532 U.S. at 738); *see also Cox v. Mayer*, 332 F.3d 422, 428 (6th Cir. 2003) ("Wrote the Court: '[The Court] will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.' And so, neither shall we.") (quoting *Booth*, 532 at 741 n. 6).

Second, as explained below, the assertion that Plaintiffs would not be permitted to grieve the "content" of policy would be true *if* Plaintiffs were making a facial challenge to the blanket application of the MDOC chair strip search policy (i.e., arguing that a specific section of the policy as outlined in PD 04.04.110 was unconstitutional), but they are not. They are plainly alleging a *violation* of that policy "as it was specifically applied" to them.[4]

---

[4] Plaintiffs claim that "[m]any of the grievances filed by women subjected to the strip search procedure were rejected for reason that the inmates were 'unable to grieve policy.'" (Pls. Mot. 9, PgID 723, referring to Wascher-McIntosh Griev. and Turner Griev.) However, a review of those grievances reveals that is simply not true. Rather, those grievances were rejected as "untimely" filed. Specifically, in the two grievances cited by Plaintiffs, it was the grievant *herself* who claimed that she did not file the grievance earlier because she allegedly was told it was not a grievable issue because it was policy, while each grievance indicates that it was actually rejected because it was untimely. (See Wascher-McIntosh Griev., PgID 746, Turner Griev., PgID 757.) Plaintiffs have failed to produce even one grievance that was rejected as improperly grieving the *content* of the strip search policy as opposed to a violation of the policy. Indeed, Plaintiff's Abcumby's grievance documents attached as an exhibit to earlier filings in this case indicate that she was expressly instructed to grieve the issue. (Abcumby Griev., PgID 919.)

Thus, to the extent Plaintiffs or putative class members are complaining that they were subjected to a strip search "in the presence of individuals other than the officer and the inmate, for whose presence there was no legitimate penological justification," they are necessarily complaining about a *violation* of the applicable policy or procedure as "specifically applied" to them, and not about the "content of a policy or procedure." Accordingly, Plaintiffs were, pursuant to PD 03.02.130, required to file grievances regarding such alleged violations and to exhaust those grievances prior to bringing such a claim in this Court. *See Townsend v. Ouellette*, No. 1:17-cv-935, 2019 WL 1333741, at *5 (W.D. Mich. Feb. 11, 2019) (plaintiff was required to grieve a dispute about the content of a policy directive regarding religious beliefs "'as it was specifically applied' to him") (citing *Wayne v. Heyns*, No. 1:13-cv-1308, 2015 WL 1478205, at *8 (W.D. Mich. Mar. 31, 2015) ("To the extent that plaintiff is asserting claims based on the policy directive as it was specifically applied to him, it is pellucid that he was required to exhaust his claims through the MDOC's grievance process before he filed his suit.")), *report and recommendation adopted by* 2019 WL 1332017 (W.D. Mich. Mar. 25, 2019); *see also Doe 1 v. Mich. Dep't of Corr.*, No. 13-14356, 2016 WL 465496, at *7-9 (E.D. Mich. Feb. 8, 2016) (requiring exhaustion of prisoners' complaints about MDOC housing policy as "specifically applied" to them). Therefore, Plaintiffs were plainly required to file a grievance

regarding any alleged violation of the strip search policy as applied to them, unless the grievance procedure was "unavailable" as described below.

> #### iv.   Any analysis regarding the "unavailability" of the grievance process would require individualized assessment precluding certification.

As explained above, the duty to exhaust administrative remedies under the PLRA is mandatory and without exception.  *Jones*, 549 U.S. at 211 ("There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court.")  The "one significant qualifier" in the statute is that "the remedies must indeed be 'available' to the prisoner."  *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016).  "Available" means "'capable of use,'" and thus "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'"  *Id.* at 1858-59 (citation omitted). The Supreme Court has identified three examples of circumstances that make a procedure unavailable: (1) "when (despite what regulations or guidance materials promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1859-60.

43

Plaintiffs appear to suggest (although they have never directly argued such a point by citing relevant authority or specific record evidence) that they and at least some putative class members should be excused from the mandatory requirement to exhaust their administrative remedies regarding claimed violations of the strip search policy because they were allegedly prevented or "thwarted" from pursuing those remedies when certain plaintiffs were allegedly told by corrections personnel that they could not grieve "policy." (*See* Pls.' Mot. 9-11, PgID 723-25; Compl., ¶¶ 35-38, alleging that Plaintiffs "are regularly not allowed to file grievances challenging policies or procedures and Defendants do not provide an alternative administrative mechanism to exhaust the claims set forth in this Complaint.")  As another court in this District has previously recognized:

> Courts have held that prison officials may render the process unavailable if they provide incorrect information about filing or fail to respond appropriately to a plaintiff's request to file. *See, e.g.*, *Davis v. Fernandez*, 798 F.3d 290 (5th Cir. 2015) ("Grievance procedures are unavailable to an inmate if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process."); *Pavey v. Conley*, 663 F.3d 899, 906 (7th Cir. 2011) ("An administrative remedy is not 'available,' and therefore does not need to be exhausted, if prison officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it."); *Dillon v. Rogers*, 596 F.3d 260, 268 (5th Cir. 2010) ("When a prisoner has no means of verifying prison officials' claims about the administrative grievance process, incorrect statements by officials may indeed make remedies unavailable."); *Brown v. Croak*, 312 F.3d 109, 112 (3rd Cir. 2002) (finding that the plaintiff raised a

44

question of fact about the availability of grievances when he was given incorrect filing information); *Smith v. Woods*, No. 9:03-CV-480, 2006 WL 1133247, at *15 (N.D.N.Y. April 24, 2006) ("[C]ase law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation," the process was unavailable.) However, the Sixth Circuit has indicated that even in these situations, "the prisoner must make some affirmative efforts to comply with the administrative procedure." *Brock v. Kenton Cty., Ky.*, 93 F. App'x 793, 798 (6th Cir. 2004). The efforts must be "'sufficient under the circumstances.'" *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015).

*Veeder v. Tri-Cap*, No. 17-cv-11690, 2018 WL 7254610, at *7 (E.D. Mich. Dec. 13, 2018), *report and recommendation adopted by* 2019 WL 208281 (E.D. Mich. Jan. 15, 2019). The Sixth Circuit explained that when "[f]aced with a policy that was not clearly unavailable, the only way to determine if the process was available, or futile, was to try. Here, a process existed, and therefore … 'compliance with those rules … is required.'" *Napier v. Laurel Cty., Ky.*, 636 F.3d 218, 224 (6th Cir. 2011) (citation omitted).[5] Further, "[i]t is well established in this Circuit that nonspecific allegations

---

[5] The *Napier* court explained that:

Our Court has consistently analyzed whether an inmate's efforts to exhaust were sufficient under the circumstances, but in each case, the prisoner did *something*. *See Bruce v. Corr. Med. Serv., Inc.,* 389 Fed. Appx. 462, 467 (6th Cir. 2010) (noting that prisoner attempted to file a grievance and "was told Policy 501.01 would not allow it"); *Flournoy v. Schomig,* 152 Fed. Appx. 535, 537 (7th Cir. 2005) (recognizing that plaintiff had submitted an "emergency grievance" before being transferred, then filed another after transfer); *Rancher v. Franklin Cnty.,*

of fear and subjective feelings of futility will not excuse a failure to exhaust administrative remedies."  *Buffman v. United States*, No. 13-cv-14024, 2015 WL 71840, at *3 (E.D. Mich. Jan. 6, 2015) (citing *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 998 (6th Cir. 2004)).

Thus, Plaintiffs' suggestion that they or certain class members were misled about their ability to grieve the chair strip searches at issue here, if true, may raise a question of fact as to whether the administrative remedies for those particular Plaintiffs/putative plaintiffs were "unavailable" to them.  This will require a fact intensive review for each claim that is not amenable to class-wide determination.  Resolution of those claims would devolve into mini-trials on exhaustion for each class member regarding what each Plaintiff or putative plaintiff knew or should have discovered about the grievance process, which MDOC individual(s) each class member allegedly spoke to, *what* was said and *when*.  Plaintiffs also will be required to demonstrate, for every claimed "unavailable remedy," the "affirmative efforts" made to comply with the grievance procedure "under the circumstances" (i.e.,

---

122 Fed. Appx. 240, 242 (6th Cir. 2005) (excusing the exhaustion requirement because the prisoner had filed a grievance with the jail, contacted prison personnel, and submitted documents from other prisoners stating that the jail had refused to accept medical grievances).

*Napier*, 636 F.3d at 224 (emphasis in original).

attempts to file a grievance) and the results of those efforts.  And if Plaintiffs make this showing, Defendants then would be permitted to respond to each claim and "present evidence showing that the plaintiff's ability to exhaust was not hindered." *Surles*, 678 F.3d at 457 n.10; *see also McBee v. Campbell Cty. Detention Ctr.*, No. 17-5481, 2018 WL 2046303, at *4 (6th Cir. Mar. 15, 2018) (requiring "defendants [to] present 'proof that they did not interfere with [a prisoner's] ability to exhaust [her] administrative remedies'") (quoting *Surles*, 678 F.3d at 457); *Doe 1*, 2016 WL 465496, at *11 (noting that if a plaintiff contends he was prevented from exhausting his administrative remedies, the defendant must present evidence that the plaintiff's ability was not hindered).  *See also Ratliff v. Graves*, 761 F. App'x 565, 566-67 (6th Cir. 2019) (plaintiff's remedies not unavailable even though jailer failed to provide grievance forms in response to several requests where evidence showed that plaintiff failed to ask other jailers for forms and failed to establish that other jailers "thwarted" him); *Doe 1*, 2016 WL 465496, at *11 (grievance procedure not unavailable even though "prisoners were informed that the issues 'will be handled administratively' and that the investigations were conducted and closed by PREA investigators, and thus "'Defendants did not utilize the grievance procedure to resolve the sexual misconduct grievances and the response of the MDOC did not allow for any appeal to step 2 or

3 of the grievance process'" because plaintiffs *still* could have appealed to step 2 or 3 if dissatisfied or if they did not receive a timely response).

The need for individualized inquiries as to liability, exhaustion, and the availability of exhaustion defeats commonality and typicality, and results in the certainty that individualized factual and legal issues would predominate over class-wide issues.

## C.    Ascertainability

Although generally a threshold issue, the Court notes here in closing that the proposed Plaintiff class is not sufficiently ascertainable. "[B]efore a court may certify a class pursuant to Rule 23, 'the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537-38 (6th Cir. 2012) (citation omitted); Newberg on Class Actions § 3:3 (5th ed.) ("Courts generally treat the requirement [of definiteness] as a precursor to Rule 23 and therefore examine the implicit requirements before proceeding the Rule's explicit requirements.") In evaluating the "ascertainability" of a class, the Sixth Circuit has indicated that class definitions which are "amorphous" or "imprecise" do not meet this standard. *Id.* at 537-38 (citation omitted). Further,

> [f]or a class to be sufficiently defined, the court must be able to resolve the question of whether class members are included or excluded from the class by reference to objective criteria. In some circumstances, a reference to damages or injuries caused by particular wrongful actions taken by the defendants will be sufficiently objective for proper inclusion in a class definition.

*Id.* at 538-39 (citation omitted); Newberg on Class Actions § 3.1 (5th ed.) ("Despite the specificity of Rule 23, courts have grafted onto it two additional criteria, often referred to as the 'implicit requirements' of class certification: that the class be 'definite' or 'ascertainable' and that the class representative be a member of the class.").

Applying these standards, this Court found in its initial Order denying class certification that the proposed class definition quoted above "is ascertainable and can be determined based on objective criteria such as exhausted grievances" (12/22/16 Order 11, Pg ID 516), but went on to deny Plaintiffs' initial class certification motion on a combination of numerosity, typicality, and adequacy grounds (*see id.* at 11-15, Pg ID 516-20). Now, Defendants argue in opposition to Plaintiffs' Motion for Class Certification that Plaintiffs have failed to show that administrative grievances are in fact a valid method for determining an ascertainable class, since they have failed "to submit any exhausted grievances, even after they have acknowledged that the best

means of ascertaining the class is by exhausted grievances." (Defs.' Resp. 4, PgID 942.)

In their Reply, Plaintiffs propose a new criteria for ascertaining class membership: the 188 affidavits discussed at length *supra* that have been sworn by inmates who allege that they were subjected to "chair" strip searches at WHV in view of other inmates or individuals not necessary to serve any penological purpose. (ECF Nos. 92, 93, 94.) Although they assert that they "initially believed that they would be able to use the grievances as an ascertainable means for determining class membership, the Plaintiffs learned throughout discovery that the strip search procedure was policy and therefore not grievable." (ECF No. 73, Pls.' Reply Supp. Class Cert. at 2, Pg ID 1806.) Plaintiffs also cite Sixth Circuit authority supporting the use of class-member affidavits as a method of determining ascertainability, at least where there are other independent means of verifying class membership. *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525-27 (6th Cir. 2015) (upholding the district court's determination that a proposed class was ascertainable because the class was defined by objective criteria, and could be corroborated through the use of the defendant's internal data and class member affidavits). However *Rikos* is not a case controlled in any way by the exhaustion requirements of the PLRA. In fact, Plaintiffs have failed to cite any law that stands for the proposition that inmate affidavits,

50

submitted years after the events they purport to describe, can substitute for properly filed and exhausted contemporaneous grievances.  Indeed to allow such a practice would thwart the very purpose of the grievance exhaustion requirement, which is to alert the institution to the allegedly offending conduct and to permit the institution an opportunity to address that conduct short of a legal confrontation with the inmate. Without first addressing the exhaustion of each class member's grievance of the non-private nature of the search, the class as defined is not sufficiently ascertainable.

### D.   Conclusion as to Class Certification

"The crux of this case is commonality." *Dukes*, 564 U.S. at 349.  Individualized issues as to liability and exhaustion as to each putative class members' chair search experiences abound and defeat commonality and typicality in this action, and those individualized inquiries predominate over any class-wide issues that Plaintiffs have presented.  Accordingly, the Plaintiffs' Motion to Certify Class is DENIED.

### III.   The Court Will Hold a Bench Trial on the Issue of the Two Named Plaintiffs' Exhaustion of Administrative Remedies to Determine Whether This Action May Proceed to Trial as to the Two Named Plaintiffs

As discussed above, there are disputed issues of fact regarding whether the two named Plaintiffs, Abcumby and Salem, have exhausted their administrative remedies regarding the sole remaining issue in this case – that they were subjected to chair strip

51

searches performed in the presence of individuals who were unnecessary to the penological purposes of the search – including whether exhaustion may be excused if those remedies were "unavailable" to each of the plaintiffs.  The Sixth Circuit Court of Appeals has held that "disputed issues of fact regarding exhaustion under the PLRA present[] a matter of judicial administration that could be decided in a bench trial." *Lee v. Willey*, 789 F.3d 673, 678 (6th Cir. 2015).[6]  In deciding that issue, the Sixth Circuit explained that "exhaustion under the PLRA is analogous to other threshold issues of judicial administration that 'courts must address to determine whether litigation is being conducted in the right forum at the right time,'" and that "[m]atters of judicial administration often require judges to decide factual disputes that are not bound up with the merits of the underlying dispute."  *Id.* (quotation marks and citations omitted).  The rationale behind a judge making a preliminary determination regarding exhaustion under the PLRA is that "[a] jury might decide the merits of the case that should never have gotten to the merits stage because the judge should have

---

[6] The *Lee* court noted that "all six of the circuits that have addressed th[is] issue agree that 'judges may resolve factual disputes relevant to the exhaustion issue without the participation of the jury.'"  *Id.* at 677-78 (citing *Small v. Camden Cty.*, 728 F.3d 265, 271 (3d Cir. 2013); *Messa v. Goord*, 652 F.3d 305, 308-09 (2d Cir. 2011) (per curiam); *Dillon v. Rogers*, 596 F.3d 260, 272 (5th Cir. 2010); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008); *Bryant v. Rich*, 530 F.3d 1368, 1373-77 (11th Cir. 2008); *Wyatt v. Terhune*, 315 F.3d 1108, 1119-20 (9th Cir. 2003), *overruled on other grounds by Albion v. Baca*, 747 F.3d 1162, 1166, 1170-71 (9th Cir. 2014) (en banc), *cert. denied*, 135 S. Ct. 403 (2014)).

found that the prisoner had failed to exhaust his administrative remedies." *Lee v. Freeman*, No. 16-14162, 2017 WL 4158794, at *6 (E.D. Mich. Aug. 25, 2017), *report and recommendation adopted by* 2017 WL 4150789 (E.D. Mich. Sept. 19, 2017). Within the context of these evidentiary hearings, federal district court judges can resolve all genuine issues of material fact related to the exhaustion of administrative remedies, including making credibility determinations, and these findings must be accepted unless they are clearly erroneous. *Lee*, 789 F.3d at 678-80; *Hill v. Smith*, 186 F. App'x 271, 274 (3d Cir. 2006) (review of a district court's "factual findings on exhaustion is for clear error, giving due regard for the opportunity of the trial court to judge the credibility of the witnesses.").

Accordingly, the matter will be set for a bench/evidentiary hearing directed solely to the issue of whether Plaintiffs Salem and Abcumby have exhausted their administrative remedies regarding the claim that they were subject to chair strip searches performed in the presence of individuals who were unnecessary to the legitimate penological purpose of the search, including whether the grievance process for that claim was "unavailable" to either Plaintiff. The parties may submit exhibits limited solely to this issue, which may include affidavits or declarations of Abcumby, Salem and/or the MDOC officials involved in the grievance process and any relevant MDOC grievance records for the two named Plaintiffs, including any MDOC Step III

Grievance Report(s) with attached grievances for Abcumby and/or Salem. Affidavits, declarations or other documents regarding grievance records for prisoners or former prisoners other than Abcumby and Salem may not be submitted to the Court for purposes of this evidentiary hearing.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Certify Class (ECF No. 66) is DENIED.

Plaintiffs' Motion for Leave of Court to File Additional Affidavits (ECF No. 95) is DENIED.

A bench trial on the issue of the named Plaintiffs' exhaustion of administrative remedies will be held on **November 6, 2019 at 10:00 a.m**. The parties are hereby **ORDERED** to file with the Court and to submit to opposing counsel bench briefs up to ten (10) pages in length (in compliance with E.D. Mich. L.R. 5.1 regarding formatting of briefs) and all proposed exhibits (limited in content as discussed *supra*) two weeks in advance of the hearing.

IT IS SO ORDERED.

Dated: September 16, 2019                          s/Paul D. Borman
                                                    Paul D. Borman
                                                    United States District Judge